Christina AXSON–FLYNN, Plaintiff,

v.

Xan JOHNSON, Sandy Shotwell, Sarah Shippobotham, Barbara Smith, Jerry Gardner, and John Does 1–20, Defendants.

No. 2:00–CV–00033C.

United States District Court,
D. Utah,
Central Division.

Aug. 3, 2001.

James W. McConkie, III, Bradley H. Parker, Elizabeth A. Clark, Parker & McConkie, Salt Lake City, UT, Steffen N. Johnson, Mayer Brown & Platt, Chicago, IL, for plaintiff.

Peggy E. Stone, Alain C. Balmanno, Utah Attorney General's Office Litigation Unit, Elizabeth King Burgess, Clawson Burgess LLC, Salt Lake City, UT, for defendants.

## ORDER

CAMPBELL, District Judge.

This case involves the scope of First Amendment protections of the Free Exer-

cise of Religion and Free Speech. Plaintiff's suit, brought under 42 U.S.C. § 1983, rests on the contention that Defendants' Acting Program curricular requirements that she use language that she found objectionable amount to a constitutionally impermissible infringement of her rights to Free Exercise and Free Speech. This matter is before the court on Defendants' motion for summary judgment. For their part, Defendants argue that Plaintiff's Free Exercise and Free Speech claims fail as a matter of law. Defendants further argue that Plaintiff's Hybrid Rights claim also fails as a matter of law, and that, if any of these claims do not fail as a matter of law, Defendants are nevertheless entitled to qualified immunity.

For the reasons set forth below, Defendants' motion is GRANTED.

## Background

For the purposes of their summary judgment motion, Defendants have accepted Plaintiff's alleged facts as undisputed and therefore the court will recount the facts accordingly. (*See* Def.'s Reply to Pl.'s Mem. in Opp. to Def's Mot. for Summ. J. at ii.)

In 1998, Christina Axson–Flynn ("Axson–Flynn" or "Plaintiff"), a member of The Church of Jesus Christ of Latter-day Saints ("LDS" or "Mormon" herein), applied for and was accepted into the Actor Training Program ("ATP") at the University of Utah. Before her acceptance, Plaintiff attended an audition conducted by Defendants Barbara Smith, Sandra Shotwell, Jerry Gardner, and Sarah Shippobotham (collectively "Defendants"), instructors in the ATP program. At the audition, Plaintiff was asked if there was anything she was uncomfortable doing as an actor. In reply, Plaintiff informed the Defendants that she would not take her clothes off, take the name of God or Christ in vain (i.e.

using those words as profanity), or say the word "fuck."

Although it is not clear from the record whether she told her instructors the reason for her objections at the time, Axson–Flynn subsequently explained that her refusal to use the words "God" or "Christ" as profanity is based on one of the Ten Commandments, which prohibits believers from taking "the name of the Lord thy God in vain ...." *Exodus* 20:8. Plaintiff has also explained that her refusal to say the word "fuck" is due to the fact that it is religiously offensive to her because she finds that it vulgarizes what Plaintiff, as a Mormon, believes is a sacred act, appropriate only within the bounds of marriage.

Subsequent to her matriculation, many of the Defendants (except Gardner, who plaintiff has dropped from this action) apparently suggested that she "get over" her objection to using the language outlined above because not doing so would stunt her development as an actor. Defendants apparently believe, and include as a central tenet of the ATP, that it is an essential part of an actor straining to take on difficult roles, roles which sometime make actors uncomfortable and challenge their perspective.

Nevertheless, while participating in the program, Plaintiff omitted-without approval of or notice by her instructor-words and phrases that she found objectionable from one of her required performances and still received a high grade. However, when Plaintiff's professor, Defendant Smith, discovered the fact that Plaintiff had omitted the language in her earlier performance, she pressed Plaintiff even harder to use the language that Plaintiff found offensive. Ultimately, because she refused to use the language, on at least one assignment Plaintiff received a lower grade and was told that her grades would be lowered if she refused to comply with curricular re-

quirements in the future. For the rest of that semester, however, Defendant Smith apparently acquiesced and allowed Plaintiff to omit the language that Plaintiff found offensive from her performances for that class.

At the end of her first semester, Plaintiff attended her oral semester review. At that review, Defendants Smith, Shippobotham, and Shotwell confronted Plaintiff about her refusal to use the language that she found offensive and told her that she would "no longer be given an allowance on language." They also suggested that she would have to find another place to study acting if she did not modify her stance on the use of such language. In response to the comments at her review, Plaintiff took her concerns to Defendant Xan Johnson, the ATP's coordinator, but Johnson informed her that he supported the other Defendants' position on the matter.

At the beginning of her second semester, Defendants Shotwell, Smith, and Shippobotham again suggested that Plaintiff participate as required in the program, using the language that she found offensive. Plaintiff, wishing to be certain of ATP's position on the matter, then went to talk with Defendant Shotwell, the program's director. Shotwell informed Plaintiff that the ATP would not change its position. In response, Plaintiff, while not asked to leave the program, left before the end of her second semester, apparently believing that it was a foregone conclusion that she would be forced to leave the ATP.

### Analysis

The United States Supreme Court has held that the "first inquiry in any § 1983 suit ... is whether the plaintiff has been deprived of a right secured by the Constitution and laws" and that the subsequent inquiry requires that such deprivation occur under color of state law. *Baker v. McCollan,* 443 U.S. 137, 140, 99 S.Ct. 2689,

61 L.Ed.2d 433 (1979) (internal quotations omitted); *see also Gunkel v. City of Emporia,* 835 F.2d 1302, 1303 (10th Cir.1987). The rights at issue in this case are the First Amendment protections to Free Exercise of Religion and Free Speech. Plaintiff's § 1983 suit rests on the contention that Defendants' curriculum, which required her to use language that she found objectionable, deprived her of her rights of Free Exercise of Religion and Free Speech.

Conceding that they are state actors, Defendants seek summary judgment in this case, arguing that Plaintiff's Free Exercise and Free Speech claims fail as a matter of law. Defendants further argue that Plaintiff's Hybrid Rights claim (an apparent subspecies of a Free Exercise cause of action) also fails as a matter of law, and that, if any of these claims do not fail as a matter of law, Defendants are nevertheless entitled to qualified immunity. After outlining the proper standard of review, the court addresses each of these assertions in order.

### A. Standard of Review

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The party seeking summary judgment bears the initial burden of demonstrating that there is an absence of evidence to support the non-moving party's case. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In applying this standard, the court must construe all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Ra-*

*dio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Pueblo of Santa Ana v. Kelly,* 104 F.3d 1546, 1552 (10th Cir.1997).

Once the moving party has carried its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by ... affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(e)); *see also Gonzales v. Millers Cas. Ins. Co.,* 923 F.2d 1417, 1419 (10th Cir.1991). The non-moving party must set forth specific facts showing a genuine issue for trial; mere allegations and references to the pleadings will not suffice. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### B. Free Exercise

The First Amendment to the United States Constitution provides, in part, that Congress shall make no law "prohibiting the free exercise" of religion. U.S. Const. amend I. As with all guarantees of the First Amendment, the Free Exercise clause applies to state and local governments by incorporation through the Fourteenth Amendment to the United States Constitution. *See Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). Plaintiff's Free Exercise claim squarely confronts the central tension in Free Exercise jurisprudence-for this is a case in which acting in accordance with a facially neutral policy incidentally directs a citizen to act counter to her religious beliefs. Put bluntly, Plaintiff, a Christian, was instructed, even if indirectly, to break the Second Commandment in order to conform to the facially neutral and generally applicable policies of the University of Utah's ATP curriculum. Indeed, this case involves the tenuous balance between the rule of law and the rule of conscience, a balance upon which civil society necessarily depends. With respect to this conflict, the Supreme Court has noted that the determination of the propriety and necessity of accommodating religious exercise is one made by the political branches rather than judiciary:

> It may fairly be said that leaving accommodation to the political process will place at a relative disadvantage those religious practices that are not widely engaged in; but that unavoidable consequence of democratic government must be preferred to *a system in which each conscience is a law unto itself or in which judges weigh the social importance of all laws against the centrality of all religious beliefs.*

*Employment Div., Dept. of Human Resources of Oregon v. Smith,* 494 U.S. 872, 890, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) (emphasis added). Justice Frankfurter once eloquently put the matter this way: "The constitutional protection of religious freedom terminated disabilities, it did not create new privileges. It gave religious equality, not civil immunity. Its essence is freedom from conformity to religious dogma, not freedom from conformity to law because of religious dogma." *West Virginia State Bd. of Ed. v. Barnette,* 319 U.S. 624, 653, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) (Frankfurter, J., dissenting). As discussed below, under binding precedent from the United States Supreme Court, the requirements and incidental burdens that the ATP curriculum put on Plaintiff's right to Free Exercise of Religion do not violate the Constitution of the United States.

■ With regard to the scope of the Free Exercise Clause's protection of religiously motivated activity, "as a general proposition, a law (or policy) that is neutral and of general applicability need not be

justified by a compelling governmental interest even if that law incidentally burdens a particular religious practice or belief." *Swanson v. Guthrie Indep. Sch. Dist. No. I–L,* 135 F.3d 694, 697–98 (10th Cir.1998) *citing Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 531, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993). This rule is applicable to a court's review of the constitutional status of both civil and criminal laws. *See, e.g., City of Boerne v. Flores,* 521 U.S. 507, 512–13, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997) (applying test to non-criminal landmark ordinance); *Fraternal Order of Police v. City of Newark,* 170 F.3d 359, 364–66 (3d Cir.1999), *cert. denied* 528 U.S. 817, 120 S.Ct. 56, 145 L.Ed.2d 49 (1999); *Salvation Army v. Department of Community Affairs of New Jersey,* 919 F.2d 183, 194–96 (3d Cir.1990). Indeed, the Tenth Circuit has determined that this standard of review is appropriate for the purpose of assessing whether school policies are in conformance with Free Exercise protections.[1] *See Swanson,* 135 F.3d at 697–98.

■ Addressing the application of this rule, the Supreme Court has noted:

Neutrality and general applicability are interrelated, and ... failure to satisfy one requirement is a likely indication that the other has not been satisfied. A law failing to satisfy these requirements must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest.

*Lukumi Babalu Aye,* 508 U.S. at 531–32, 113 S.Ct. 2217. In defining the test for neutrality and general applicability, the Court noted "if the *object* of a law is to infringe upon or restrict practices because

of their religious motivation, the law is not neutral...." *Id.* at 533, 113 S.Ct. 2217 (emphasis added). Thus, laws which have as their purpose the suppression of religion or religious conduct are by definition neither neutral nor of general applicability. *See id.* In *Lukumi Babalu Aye,* the Court ruled that law which appeared facially neutral and generally applicable actually had as there object the suppression of the Santeria religion. *See id.* at 534–35, 113 S.Ct. 2217. The ordinances reviewed by the Court in *Lukumi Babalu Aye* prohibited ritual sacrifice, and the Court, examining the city council's debate on the topic, determined that the law was in part aimed at curtailing and outlawing Santeria practices of ritual sacrifice. *See id.* The *Lukumi Babalu Aye* Court made an explicit finding that the ordinance intentionally targeted Santeria practitioners. *See id.* Accordingly, under the test announced in *Lukumi Babalu Aye,* Plaintiff here must show that the facially neutral and generally applicable policies and class curricula of the ATP had as their object the deprivation of her right to Free Exercise. This is something that Axson–Flynn does not even allege.

Plaintiff contends that the Tenth Circuit Court of Appeals, in *Bauchman v. West High School,* clearly announced a much stricter standard for Free Exercise review. *Bauchman v. West High Sch.,* 132 F.3d 542 (10th Cir.1997). In that opinion the Tenth Circuit noted: "A Plaintiff states a claim her (sic) exercise of religion is burdened if the challenged action is coercive or compulsory in nature.... Therefore, to state a Free Exercise claim, [Plaintiff] must allege facts showing she was

---

1. Utah Code Annotated §§ 53B–16–101 & –102 statutorily enables the University of Utah to develop its curriculum within certain parameters; the University's curriculum, including the courses in the ATP, are therefore state policies, written and developed pursuant to state law, and subject to review for their conformity with the constitutional protections of the right to Free Exercise. Utah Code Ann. §§ 53B–16–101, –102 (1997).

'coerced' into [conduct] contrary to her religious beliefs." *Id.* at 557 (citations omitted).[2] Plaintiff's reliance on this statement from *Bauchman* as the standard for Free Exercise review in the Tenth Circuit is misplaced. No other Tenth Circuit opinion, nor, indeed, any subsequent opinion from any federal court, uses this formulation as the standard for examining the legitimacy of a Free Exercise claim. *Bauchman* itself was decided under the assumption that the Religious Freedom Restoration Act ("RFRA"), which attempted to expressly supercede the *Smith* decision, was operative. *See id.* at 545 (noting plaintiff's RFRA claim).[3] Indeed, *Bauchman* was decided at approximately the same time as *City of Bourne*, in which the Supreme Court invalidated RFRA, a statute which had required greater accommodation on the part of government entities and expressly superceded the *Smith* decision.[4] *See* 521 U.S. at 536, 117 S.Ct. 2157. The *Bauchman* court was apparently acting under the assumption that the general rule in *Smith* and its progeny was no longer controlling. That this is the case, is evidenced by the fact that *Bauchman* cites neither *Smith* nor *Lukumi Babalu Aye* in its Free Exercise analysis. Further evidence that the Tenth Circuit does not now follow the standard announced in *Bauchman* is readily apparent by the fact that *Swanson*, 135 F.3d 694, decided by the Tenth Circuit Court of Appeals in 1998, the very next year after *Bauchman*-by a panel of judges that included the Honorable Wade Brorby, the author of the *Bauchman* opinion-does not cite *Bauchman* for authority in its Free Exercise analysis and announces a rule directly counter to *Bauchman* and RFRA: "a law (or policy) that is neutral and of general applicability need not be justified by a compelling governmental interest even if that law incidentally burdens a particular religious practice or belief." *Swanson*, 135 F.3d 694, 697–98, *citing Lukumi Babalu Aye*, 508 U.S. at 531, 113 S.Ct. 2217.[5] Based on the above, the court concludes that *Swanson* is the case that must be followed in the Tenth Circuit.

Plaintiff asserts, partially correctly, however, that there are two exceptions to the

---

2. As at threshold matter, it must be noted that, under the logic of the *Bauchman* opinion itself, the rule relied on by the Plaintiff here is *obiter dictum*-or *gratis dictum* at the very least. The *Bauchman* court had already taken judicial notice of the fact that the *Bauchman* Plaintiff had been given an opportunity to exempt herself from the school activity that she had claimed abridged her right to Free Exercise, and that there was thus no Free Exercise question at issue. *Bauchman*, 132 F.3d at 557 n. 11, 557. Therefore, the *Bauchman* Court need not have reached the issue of what a Plaintiff must state as the basis of a Free Exercise cause of action.

3. The court also notes, after a review of the *Bauchman* case file, that the *Bauchman* plaintiff's complaint not only contained a RFRA claim, but that no brief filed in the case assumed that *Smith* and its progeny governed the Free Exercise claim at issue.

4. RFRA was explicitly enacted to supercede the rule in *Smith* and restore the compelling governmental interest test, even in cases involving facially neutral policies and laws. *See* 42 U.S.C. § 2000bb(a)(4), § 2000bb(b)(1).

5. That the *Bauchman* case did not assume that *Smith* was controlling is also evident by the fact that the case did not include a "hybrid rights" analysis in a case involving Free Exercise and Free Speech claims. Such an analysis was explicitly provided for under the *Smith* decision but would be unnecessary if the court was assuming *Smith* no longer was the law-because a heightened scrutiny test would be the rule rather than the exception under a Free Exercise analysis.

bright line Free Exercise rule adopted in *Swanson:* the first, involves cases where there are "hybrid rights" at issue, and the second where the laws or policies allow for system of individualized exemptions. The court addresses the merits of Plaintiff's hybrid rights claim in a separate section below. With regard to a claim under the "individualized exemptions" exception to the general Free Exercise rule, Plaintiff correctly notes that the Court in *Lukumi Babalu Aye* held that if the State makes religious accommodations for some individuals, it must make religious accommodations for all individuals. Citing *Smith,* the *Lukumi Babalu Aye* Court stated: "in circumstances in which individualized exemptions from a general requirement are available, the government may not refuse to extend that *system* to cases of religious hardship without compelling reasons." 508 U.S. at 537, 113 S.Ct. 2217 (citation and internal quotations omitted) (emphasis added). This language is the basis of Plaintiff's claim that her Free Exercise rights were violated. According to Plaintiff, the professors in the ATP program allowed a Jewish student to miss classes and practices on holy days without penalty and yet the ATP did not extend an exemption to her. Plaintiff asserts that the fact that her classmate was allowed to miss classes on holy days evidences a system of exemptions, and that this fact mandates that such exemptions must be made available to her absent compelling reasons.[6]

Plaintiff's reliance on this "exemption exception," however, is misplaced. *Lukumi Babalu Aye* applied this exception to instance *where the laws (in that case ordinances) themselves provided explicit ex-*

*emptions. See id.* For instance, the ordinances at issue in that case did allow slaughter of animals according to Jewish kosher customs. *See id.* at 536, 113 S.Ct. 2217. Because the accommodations were *provided in the ordinance itself* but were not available to other religious practitioners, the Court found that the Santeria practitioner's Free Exercise rights were violated. *See id.* at 536–37, 113 S.Ct. 2217. The rule from *Lukumi Babalu Aye* therefore applies to those circumstances where the policies, ordinances or statutes themselves allow exceptions or accommodations. *See, e.g., id.; see also Swanson,* 135 F.3d at 701 (rejecting claim in case where parents desired to home-school children part of school day because school attendance *policy itself* did not allow for individualized exemptions ); *Fraternal Order of Police,* 170 F.3d at 364–66 (requiring city police to allow Muslim officer to wear beards because no-beards *rule* in department policy allowed exemptions for medical reasons); *Keeler v. Mayor & City Council of Cumberland,* 940 F.Supp. 879, 885–86 (D.Md.1996) (requiring landmark *ordinance exemptions* to be extended to fit needs of Catholic church). In this case, plaintiff does not contend or allege that the curriculum requirement rules or program policies themselves allow for individualized exemptions; therefore she cannot avail herself of this exception to the general Free Exercise rule.

Plaintiff was required to comply with facially neutral and generally applicable policies and course requirements of the ATP. These provided that all students must participate in the curriculum as structured by their professors. The curri-

---

**6.** *Smith* noted that "where the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious hardship' without compelling

reason." 494 U.S. at 884, 110 S.Ct. 1595. Here, Plaintiff has alleged certain allowances, but not a *system* of individual exemptions.

cular requirements are generally applicable to all students and are facially neutral; indeed, Plaintiff pointed to no written policy or course description that suggested otherwise. Finally, Plaintiff has pointed to no reference in curricular policy, guidelines or course descriptions themselves where a system of exemptions are extended to students for religious or other reasons. Review of the description of ATP and its program, as well as the syllabus for Defendant Smith's theater class, reveals nothing to suggest the existence of a system of exemptions. (*See* "Syllabus" for Theater 1220–1, and "Department of Theater Actor Training Program, 1999–2000," attached as Exs. 4 and 7 to Defs.' Mem. in Supp. of Mot. for Summ. J.) Absent this, Plaintiff has failed to meet her burden of demonstrating a dispute of material fact necessary to withstand Defendants' motion for summary judgment. The burdens that the facially neutral and generally applicable curriculum put on Plaintiff are in conformance with the First Amendment's protection of Free Exercise rights, and Defendants are therefore entitled to summary judgment on Plaintiff's Free Exercise claim.

### C. Free Speech

 This case presents a novel question with regard to the regulation of speech in the educational forum: does required participation in a University's curriculum constitute compelled speech such that a student's action of refusal to participate, thereby subjecting her to a lower grade, is an action from which the University is barred? This question here posed is actually twofold-whether: 1) Plaintiff's requirement to participate in class constitutes, under the facts of this case, coerced speech subject to First Amendment protection; and, 2) whether Defendants possessed the authority to require complete student participation in the ATP as a prerequisite for accreditation from the program. The second issue is dealt with below in the court's treatment of Plaintiff's "hybrid rights" claim.

With regard to whether the curricular requirements amount to a constitutionally impermissible instance of coerced speech, it must first be noted that, of course, students do not "shed their constitutional rights ... at the schoolhouse gate." *Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). Indeed, Defendants concede the unremarkable principle that university students have First Amendment rights. (*See* Defs.' Reply Memo. at 8.) [7] Plaintiff again cites the *Bauchman* opinion for the proposition that: "The First Amendment certainly prohibits the government from compelling speech." 132 F.3d at 558. Plaintiff's counsel would read this excerpt as an absolute command, suggesting that any requirement for a student to participate in an in-class exercise which challenges his or her conscience or point of

---

7. Cases cited by both parties stand for the general principle that, of course, university students have free speech rights, even if those rights are not unlimited. *See, e.g., Cummins v. Campbell*, 44 F.3d 847 (10th Cir.1994) (finding university could not suspend students showing of a controversial film); *Auburn Alliance for Peace & Justice v. Martin*, 684 F.Supp. 1072 (M.D.Ala.1988) (finding students should have been allowed to hold camp in university's public forum area); *IOTA XI Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 386 (4th Cir.1993) (finding university couldn't impose sanctions on fraternity which held "ugly woman contest"); *Hays Co. Guardian v. Supple*, 969 F.2d 111 (5th Cir.1992) (finding violation for university ban of student newspaper because of anti-solicitation regulation).

view is constitutionally impermissible. This is not the rule from *Bauchman,* nor is it the test for impermissibly compelled speech formulated by the Supreme Court and followed in this Circuit.[8]

The relevant test to determine whether compelled speech is constitutionally impermissible is: 1) whether, as a threshold matter, the speech is compelled, and 2) if so, whether such compulsion "invades the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control." *Barnette,* 319 U.S. at 642, 63 S.Ct. 1178. There is no federal court case which has precisely defined the bounds of the "sphere of intellect and spirit" thus reserved, but *Barnette* stands for the proposition that a student may not be forced to espouse an ideological point of view on behalf of the State. *See id.* As the Tenth Circuit Court of Appeals has recently stated, although in a case not involving student speech rights: "The crucial question is whether ... the government is compelling others to espouse or to suppress certain ideas and beliefs." *Phelan v. Laramie County Community College Bd. of Trustees,* 235 F.3d 1243, 1247 (10th Cir.2000). Or, as the Supreme Court has stated, the question is whether the State requirement forces the individual to become "an instrument for fostering public adherence to an ideological point of view he finds unacceptable." *Wooley v. Maynard,* 430 U.S. 705, 715, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977) (striking down state statute compelling individual to display state motto on license plates).

Defendants acknowledge that Plaintiff will be required to use the language that she finds objectionable as part of her curricular requirements as a student in the ATP. This, as an initial matter, amounts to a degree of compulsion. The relevant question is therefore whether this requirement "invades the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control." *Barnette,* 319 U.S. at 642, 63 S.Ct. 1178. As discussed below, the logic of the *Wooley* and *Barnette* opinions suggest that a student cannot be required to espouse an ideological point of view on behalf of the State. *Barnette,* the only case nearly on point, involved an instance where students who were Jehovah's Witnesses were required to salute the flag and then recite the pledge of allegiance in direct contravention of their religious and ideological belief that they may not espouse allegiance to an authority other than God. *See* 319 U.S. at 631–32, 63 S.Ct. 1178. The Court found this requirement to invade the sphere of intellect and spirit of the students in constitutionally impermissible ways. *See id.* at 642, 63 S.Ct. 1178.

The difference between that case and the present is that the ATP faculty are not requiring Plaintiff to espouse an ideological position at all; they merely asked her to read some lines which she finds offensive. She is not being asked to bear an ideological message or accept as her own an ideological proposition of the State in this instance. That this distinction is one which the Court draws for First Amendment purposes is illustrated in *Wooley.* *Wooley* involved New Hampshire's old licence plate motto: "Live Free or Die." The Court found that in that case the state

---

8. Again, as above in the case of *Bauchman's* treatment of the right to Free Exercise, the court did not have to announce a rule because it concluded beforehand that as a factual matter the *Bauchman* plaintiff had not been compelled. Therefore, this rule is *obiter dictum* or *gratis dictum.*

essentially "forces an individual ... to be an instrument for fostering adherence to an ideological point of view." *Id.* at 715, 97 S.Ct. 1428.

*Barnette* and *Wooley* both involved requirements where persons were bound to espouse an ideology not their own on the State's behalf and for the benefit of a State ideology. That is not the case here. Defendants are correct in pointing out that Plaintiff is not being asked to be an instrument for, or adhere to, an ideological point of view at all. She is being asked to participate in a classroom exercise. Were this a First Amendment violation, then a believer in "creationism" could not be required to discuss and master the theory of evolution in a science class; a neo-Nazi could refuse to discuss, write or consider the Holocaust in a critical manner in a history class. Indeed, a Catholic law student could not be required to make an argument in favor of capital punishment during an in-class exercise designed to enable law students to argue cases they find unsympathetic. Just as it is reasonable for law school faculty to find that such an ability is necessary for competent would-be lawyers, so is it reasonable for an acting program faculty to use such exercises to foster an actor's ability to take on roles of persons they might find disagreeable. None of the hypothetical situations outlined above involve a citizen being called upon to espouse an ideology on behalf of the State-something that the constitution, as discussed above, certainly proscribes. Rather, these scenarios merely illustrate the fact that learning in a University setting involves the ability to discuss and take on other points of view in a serious manner. These exercises do not ask one to accept or espouse such positions for their truth; they merely foster the understanding and competency necessary for obtaining accreditation from a University degree program. Because she is not being asked to espouse an ideology that is not her own, Plaintiff's Free Speech claim fails as a matter of law, and Defendants are entitled to summary judgment on this claim.

### D. Plaintiff's "Hybrid–Rights" Cause of Action

Plaintiff also asserts that, because her § 1983 cause of action invokes both the right of Free Exercise and to Free Speech, she has a "hybrid" cause of action which requires the ATP curricular policy to be evaluated under a heightened scrutiny test. The previous sections determined that compelling the speech and conduct forbidden by Plaintiff's beliefs did not violate her right to Free Speech or unconstitutionally burden her right to Free Exercise of Religion as those rights are protected by the Constitution and delineated in Supreme Court holdings. Plaintiff's "hybrid-rights" argument here is based on an interpretation of a section of the *Smith* opinion, in which the Supreme Court noted the difference between cases solely involving the Free Exercise Clause and those involving "the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech ...." *Smith,* 494 U.S. at 881, 110 S.Ct. 1595. In such situations, the *Smith* opinion suggests that heightened scrutiny would apply. *See id.* at 881–82, 110 S.Ct. 1595. Therefore, under the hybrid rights doctrine announced in *Smith,* the court here must determine whether Defendants of necessity have the authority to require student participation in the ATP as a prerequisite for accreditation from the program, such that these requirements do not impermissibly infringe Plaintiffs hybrid rights.

The so-called "hybrid rights" doctrine that has evolved as a result of the *Smith*

decision has left many courts and scholars confounded as to the precise contours of a proper hybrid rights claim-one scholar noting that:

> what the Court must have meant is that a less than sufficient free exercise claim, plus a less than sufficient claim arising under a different part of the Constitution, together trigger the compelling interest test. In other words, the cumulative effect of two or more partial constitutional rights equals one sufficient constitutional claim.

Richard F. Duncan, "Who Wants to Stop the Church: Homosexual Rights Legislation, Public Policy, and Religious Freedom", 69 NOTRE DAME L. REV. 393, 430–31 (1994). This unsettled area of constitutional law has left others frustrated, causing them, somewhat disingenuously, to refer to a hybrid claim as a "two-for-one sale[,]" observing that, under the hybrid rights doctrine, two losers equal one winner of a claim. Rodney A. Smolla, "The Free Exercise of Religion After the Fall: The Case for Intermediate Scrutiny," 39 WM. & MARY L. REV. 925, 930 (1998). Indeed, one of the foremost scholars in the field of constitutional protections for religious liberty has discerned, when reflecting on the difficulties in assessing *Smith*'s delineation of hybrid rights doctrine, that "a legal realist would tell us ... that the *Smith* Court's notion of 'hybrid' claims was not intended to be taken seriously." Michael W. McConnell, "Free Exercise Revisionism and the *Smith* Decision," 57 U. CHI. L. REV. 1109, 1122 (1990).[9] Even members of the Supreme Court appear puzzled by the contours of such a claim.

In his concurrence in *Lukumi Babalu Aye*, Justice Souter observed that:

> the distinction *Smith* draws strikes me as ultimately untenable. If a hybrid claim is simply one in which another constitutional right is implicated, then the hybrid exception would probably be so vast as to swallow the *Smith* rule, and, indeed, the hybrid exception would cover the situation exemplified by *Smith*, since free speech and associational rights are implicated in the peyote smoking ritual. But if a hybrid claim is one in which a litigant would actually obtain an exemption from a formally neutral, generally applicable law under another constitutional provision, then there would have been no reason for the Court in what *Smith* calls the hybrid cases to have mentioned the Free Exercise Clause at all.

508 U.S. at 567, 113 S.Ct. 2217. It must be acknowledged, therefore, at the outset of the court's inquiry here, as the Tenth Circuit itself has found, that it "is difficult to delineate the exact contours of the hybrid-rights theory discussed in *Smith*." *Swanson*, 135 F.3d at 699.

The *Swanson* Court, however, clearly provides the following guidance: "simply raising such a claim is not a talisman that automatically leads to the application of the compelling-interest test. We must examine the claimed rights to determine whether either the claimed rights or the claimed infringement are genuine." *Id.* The *Swanson* Court further noted that a hybrid claim "requires a colorable showing of infringement of recognized and specific constitutional rights, rather than the mere

---

**9.** One court has gone so far as to suggest that the legal standard of review does not change simply because constitutional principles other than the Free Exercise Clause had been impli-

cated, and held that a stricter standard of review would not apply in such cases. *See Kissinger v. Board of Trustees*, 5 F.3d 177, 180 (6th Cir.1993).

invocation of a general right[;] ... [I]t is not sufficient simply to invoke the Free Exercise Clause as well as another general constitutional claim to trigger the compelling-interest/narrowly tailored rule." *Id.* at 700. The *Swanson* Court explained that a reviewing court "must examine the claimed infringements on the party's claimed rights to determine whether either the claimed rights or the claimed infringements are genuine." *Id.* In *Swanson,* the Court found no colorable claim of infringement of another constitutional right, did not apply a heightened level of scrutiny, and, as discussed below, left open the question regarding what level of scrutiny properly applied in hybrid rights cases. *See id.* at 699–701.

As a threshold matter, therefore, it is clear that under the mandate of *Swanson* that the court must determine whether Plaintiff has raised a "colorable" claim such that the hybrid rights cause of action is available to her. As discussed above, Plaintiff's Free Speech cause of action fails as a matter of law; she was not compelled to speak in a manner that offends constitutional guarantees to the right to Free Speech. According to Black's Law Dictionary, a colorable claim is one "appearing to be true, valid, or right." BLACK'S LAW DICTIONARY 259 (Deluxe 7th ed.1999). If this definition is taken as the standard, it cannot be said that Plaintiff has a colorable Free Speech claim which would invoke a higher level of scrutiny; she has not made a "showing of infringement of recognized and specific constitutional rights" that appears true, valid, or right because her Free Speech claim fails as a matter of law. *Swanson* 135 F.3d at 700. The Tenth Circuit, however, it seems, has more generously defined what constitutes a colorable claim, holding that:

[t]o determine whether a claim is colorable, it is necessary to examine its mer-

its. A determination that a claim lacks merit, however, does not necessarily mean it is so lacking as to fail the colorable test. A ... claim ... is not colorable if it is immaterial and made solely for the purpose of obtaining jurisdiction or ... is wholly insubstantial or frivolous.

*Harline v. DEA.* 148 F.3d 1199, 1203 (10th Cir.1998) (internal quotation marks omitted); *see also United States v. McAleer,* 138 F.3d 852, 857 (10th Cir.1998) (defining "colorable" as having "some possible validity"). Because Plaintiff raised a genuine question regarding whether required participation in the ATP constituted government compelled speech offending constitutional Free Speech protections, her claim was not "wholly insubstantial or frivolous." *Harline v. DEA,* 148 F.3d at 1203. She therefore made a colorable Free Speech claim under the generous Tenth Circuit standards.

Because the Plaintiff has raised a colorable hybrid claim in this case, we must evaluate her claim under the appropriate standard of review. *See Swanson,* 135 F.3d at 699–700. Plaintiff asserts that the compelling interest/closely tailored standard of review clearly applies in all such hybrid cases. Neither *Swanson,* as discussed below, nor *Smith* itself, however, compel this conclusion. *See, e.g., Smith,* 494 U.S. at 881–83, 110 S.Ct. 1595 (discussing various standards of review for hybrid situations and noting that compelling state interest test outlined in *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), is not applied to hybrid cases except those involving unemployment compensation); *see also* McCONNELL, 57 U. CHI. L. REV. at 1127–28 (noting that " 'compelling interest' standard is a misnomer" for hybrid rights claims but that Court

outlined standard of review entails "heightened scrutiny").

The Tenth Circuit clearly agrees that the proper scrutiny for review of a hybrid rights claim is a heightened one. *See Swanson,* 135 F.3d at 699. However, because the *Swanson* court determined that the Plaintiffs did not have a colorable hybrid claim, it did not apply any heightened standard of scrutiny test and did not detail which heightened standard test discussed by the *Smith* Court would actually apply. *See Swanson,* 135 F.3d at 700 (holding that "this is not a hybrid-rights case[,]" because Plaintiffs demonstrated "no colorable claim of infringement on the constitutional right").

*Swanson* does offer guidance, however, on the proper standard of scrutiny to be applied in hybrid cases; the opinion directs the court to look to the *Smith* opinion itself, and suggests that the proper heightened standard is that which was applied in *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). *See Swanson* 135 F.3d at 699. *Yoder* held that when hybrid rights are involved "the government must establish more than merely a reasonable relationship between its law and a purpose within the competency of the State ... to sustain the validity of the State's requirement under the First Amendment." 406 U.S. at 233, 92 S.Ct. 1526. The *Swanson* court suggested that this "more-than-reasonable-relationship, *it could be argued,* is *similar* to the compelling-interest test set out in *Sherbert."* *Swanson,* 135 F.3d at 699 (emphasis added). *Smith* itself clearly stated, however, that the Court never applied the standard from *Sherbert* 's compelling-interest test outside the context of worker's compensation matters and therefore the *Sherbert* test cannot be applicable to hybrid rights

cases outside that arena. *See* 484 U.S. at 882–83, 108 S.Ct. 39. Because *Yoder,* also cited by the *Smith* and *Swanson* Courts, dealt directly with plaintiffs' desire for an exemption from educational policy requirements due to religious objections-the subject matter of this case-the court looks to *Yoder* and other cases, cited in *Swanson,* involving curricular requirements and arguable hybrid rights for direction. *See Smith,* 494 U.S. at 881–82, 110 S.Ct. 1595; *Swanson* 135 F.3d at 699.

■ With regard to the special academic setting in which this case arises, it must be initially noted that the Court has a long history of deferring to the judgment of educators, especially involving matters of curricular requirements. In the academic context, the Court suggests that judicial intervention in any form should be undertaken only with the greatest reluctance. *See, e.g., Regents of Univ. of Mich. v. Ewing,* 474 U.S. 214, 226, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985) (declaring federal courts unsuited "to evaluate the substance of the multitude of academic decisions that are made daily by faculty members of public educational institutions"). Indeed, the Court has clearly noted that the federal judiciary is ill-equipped to evaluate the proper emphasis and content of a school's curriculum. *See Board of Curators of Univ. of Mo. v. Horowitz,* 435 U.S. 78, 89–91, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978). This judicial deference to educators in their curriculum decisions is no less applicable in a clinical setting-as in this case with the ATP's practical acting curriculum; evaluation in a practice setting "is ... an 'academic' judgment because it involves observation of ... skill and techniques in actual conditions of practice, rather than assigning a grade to ... written answers on an essay question." *Id.* at 98, 98 S.Ct. 948 (Powell, J., concurring).

With this deference in mind, the Court has held that pupils may be expelled if they will not read from the Bible, so long as the Bible is only used as literature, and not taught as religious truth. *See Sch. Dist. of Abington v. Schempp*, 374 U.S. 203, 224–25, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963). It has also held that curricular requirements may be imposed upon students even when those requirements directly counter a student's religious belief. *See Hamilton v. Regents of the Univ. of Cal.*, 293 U.S. 245, 265–67, 55 S.Ct. 197, 79 L.Ed. 343 (1934) (Justice Cardozo in concurrence noting that compelling military education for students whose religious beliefs make military service anathema does not violate First Amendment protections). Indeed, the Court has even gone so far as to hold that it violates the Establishment Clause to tailor a public school's curriculum to satisfy the principles or prohibitions of any religion. *See Epperson v. Arkansas*, 393 U.S. 97, 106, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968).

*Yoder* itself involved a singular set of facts and the Court noted the highly individualized character of the hybrid right involved in that case, which the Court properly determined by "the nature revealed by [the] record." 406 U.S. at 233, 92 S.Ct. 1526. The plaintiff parents in *Yoder* were Old Order Amish and members of the Conservative Amish Mennonite Church, who objected to their children being required to attend either public or private schools beyond the eighth grade. Wisconsin school attendance laws required them to cause their children to attend school until they reached the age of 16. The "more than reasonable relationship" between this law and the competency of the State was claimed to be that compulsory education helped assimilate children into society. The *Yoder* Court found that,

under the singular facts at issue, the compulsory attendance rule was not reasonable. *See id.* at 232–234, 92 S.Ct. 1526. The Old Order Amish and the Conservative Amish Mennonites separate themselves from the world and avoid assimilation into society, and attempt to shield their children from all worldly influences. The Supreme Court found from the record that—

> [C]ompulsory school attendance to age 16 for Amish children carries with it a very real threat to undermining the Amish community and religious practice as they exist today; they must either abandon belief and be assimilated into society at large, or be forced to migrate to some other and more tolerant region.

*Id.* at 218, 92 S.Ct. 1526 (footnote omitted). As if to emphasize the narrowness of its holding because of the unique 300 year history of the Old Amish Order, the Court wrote:

> It is one thing to say that compulsory education for a year or two beyond the eighth grade may be necessary when its goal is the preparation of the child for life in modern society as the majority live, but it is quite another if the goal of education be viewed as the preparation of the child for life in the separated agrarian community that is the keystone of the Amish faith.

*Id.* at 222, 92 S.Ct. 1526 (citation omitted).

This statement points up dramatically the difference between *Yoder* and the present case. The ATP curricular requirements do not carry with them "a very real threat to undermining [Plaintiff's] community and religious practice as they exist today." *Id.* at 218, 92 S.Ct. 1526. Yet, under the balancing test outlined in *Yoder*, the government must establish

must establish more than merely a reasonable relationship between its law and a purpose within the competency of the State. *See* 406 U.S. at 233, 92 S.Ct. 1526. The curricular requirements of the ATP program are more than reasonably related to the University's special competency of assuring that its graduates are proficient in their field of chosen study. Indeed, with regard to the question of whether determining University curricula is within the competency of the state, as discussed above, courts uniformly recognize that it is within the academy's singularly special competence to determine the propriety of its own degree requirements and to determine whether students have satisfied those requirements. Courts are loath to meddle in such determinations. This is so because they have long recognized that educational requirements are within the special competency of State educational institutions. The Tenth Circuit Court of Appeals recognized this to be the case when it recently noted: "when judges are asked to review the substance of a genuinely academic decision, . . . they should show great respect for the faculty's professional judgment." *Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1181 (10th Cir.2001) *quoting Ewing*, 474 U.S. at 225, 106 S.Ct. 507. This is the case because University's are licensing institutions. They of necessity determine the competency necessary for obtaining accreditation from their own degree programs. Given this, there is more than a reasonable relationship between ATP's purpose of assuring that its graduates are competent to take on challenging roles, and the ATP's curricular requirements.

Plaintiff's formulation of her hybrid right would suggest that the combined rights of Free Speech and Free Exercise require that university students be allowed exemptions for religious reasons from certain degree requirements that offend their beliefs and yet still be permitted to obtain the same degree as other students who cannot avail themselves of the same exemptions. Such a constitutional mandate would undermine the ability of the academy to ensure that its graduates have the competency that their degrees represent. Courts facing nearly identical claims as the one confronting the court in this matter have come to the same conclusion. *See, e.g., Kissinger v. Board of Trustees of the Ohio State Univ. College of Veterinary Med.*, 5 F.3d 177, 179–181 (6th Cir.1993) (holding that student could not be exempted on free exercise grounds from curricular requirement of performing surgery on live animals); *Mozert v. Hawkins Co. Bd. of Ed.*, 827 F.2d 1058 (6th Cir.1987) (holding that students could not be exempted from general reading requirements because of parents' religious objections to school's reading curriculum), *cert. denied*, 484 U.S. 1066, 108 S.Ct. 1029, 98 L.Ed.2d 993 (1988). Because there is more than merely a reasonable relationship between the ATP curricula and the purpose of ensuring that ATP graduates have sufficient competency in their chosen field, Defendants have shown that Plaintiff's hybrid rights claim fails as a matter of law and that Defendants are entitled to summary judgment on this claim.

### E. Qualified Immunity

■ Defendants have also raised the defense of qualified immunity. The Supreme Court has held that government officials are entitled to some immunity from suits for damages. *See Nixon v. Fitzgerald*, 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982). The Court has recognized that "where an official's duties legitimately require action in which clearly established rights are not implicated, the public inter-

est may be better served by action taken 'with independence and without fear of consequences.'" *Harlow v. Fitzgerald,* 457 U.S. 800, 819, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), *quoting Pierson v. Ray,* 386 U.S. 547, 554, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). The qualified immunity doctrine "gives ample room for mistaken judgments" by protecting "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). It "is an immunity from suit rather than a mere defense to liability; and like absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).

The Court has directed how a trial court, faced with a claim of qualified immunity, must proceed:

> A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show [that] the officer's conduct violated a constitutional right? This must be the initial inquiry. In the course of determining whether a constitutional right was violated on the premises alleged, a court might find it necessary to set forth principles which will become the basis for a holding that a right is clearly established. This is the process for the law's elaboration from case to case, and it is one reason for our insisting upon turning to the existence or nonexistence of a constitutional right as the first inquiry. The law might be deprived of this explanation were a court simply to skip ahead to the question whether the law clearly established that the officer's conduct was unlawful in the circumstances of the case.

> If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established. This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition; and it too serves to advance understanding of the law and to allow officers to avoid the burden of trial if qualified immunity is applicable.

*Saucier v. Katz,* 531 U.S. 991, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001) (internal citations omitted).

As discussed above, Defendants did not violate Plaintiff's First Amendment rights. Also as discussed above, Defendants are entitled to summary judgment on Plaintiff's hybrid rights claim. However, if Defendants might be subject to a suit on a theory under the hybrid rights doctrine, they are entitled to qualified immunity on the hybrid claim because they violated no clearly established law-the Tenth Circuit itself noting, for example, that "[i]t is difficult to delineate the exact contours of the hybrid-rights theory discussed in *Smith* . . . [and that such cases inherently demonstrate] 'the difficulty of the *Smith* exception.'" *Swanson,* 135 F.3d at 699, 700. Consequently, the Court finds that the Defendants are entitled to qualified immunity and summary judgment on all of Plaintiff's claims.

*Order*

For the reasons set forth above, Defendants' motion for summary judgment is GRANTED.