**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 3 2004**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

CHRISTINA AXSON-FLYNN,

     Plaintiff - Appellant,

v.

XAN JOHNSON; SANDY
SHOTWELL; SARAH
SHIPPOBOTHAM; BARBARA
SMITH; JERRY GARDNER; and
JOHN DOES 1-20,

     Defendants - Appellees,

and

MICHAEL J. BROYDE; J.
BUDZISZEWSKI; SHALOM
CARMY; LOUIS DUPRÉ; C.
STEPHEN EVANS; JOHN FARINA;
BARRY FREUNDEL; PAUL
GRIFFITHS; WAYNE GRUDEM;
STANLEY A. HAUERWAS;
GREGORY A. KING; ROBERT L.
MILLET; DAVID NOVAK; ALVIN
PLANTINGA; GEDALIAH
SCHWARTZ; MAX L.
STACKHOUSE; WALTER
SUNDBERG; CHARLES
TALIAFERRO; JOHN WITTE, JR.;
NICHOLAS WOLTERSTORFF; IRA
YOUDOVIN; AMERICAN
ASSOCIATION OF UNIVERSITY
PROFESSORS; INDUSTRY
PROFESSIONALS AND

No. 01-4176

PROFESSORS; CHRISTIAN FILM
AND TELEVISION COMMISSION,

Amici Curiae.

---

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 2:00-CV-0033-C)**

---

Michael S. Paulsen, Professor, University of Minnesota Law School, Minneapolis, Minnesota (Steffen N. Johnson and David W. Fuller, Mayer, Brown, Rowe & Maw, Chicago, Illinois; James W. McConkie and Bradley H. Parker, Parker & McConkie, Salt Lake City, Utah; Stephen M. Shapiro, Mayer, Brown, Rowe & Maw, Washington, D.C., with him on the briefs), for Plaintiff-Appellant.

Peggy E. Stone, Assistant Utah Attorney General (Mark Shurtleff, Utah Attorney General, with her on the briefs), Salt Lake City, Utah, for Defendants-Appellees.

Gene C. Schaerr, Nicholas P. Miller and Achiezer Guggenheim, Sidley Austin Brown & Wood LLP, Washington, D.C., filed an amici brief for Michael J. Broyde, J. Budziszewski, Shalom Carmy, Louis Dupré, C. Stephen Evans, John Farina, Barry Freundel, Paul Griffiths, Wayne Grudem, Stanley A. Hauerwas, Gregory A. King, Robert L. Millet, David Novak, Alvin Plantinga, Gedaliah Schwartz, Max L. Stackhouse, Walter Sundberg, Charles Taliaferro, John Witte, Jr., Nicholas Wolterstorff, and Ira Youdovin, amici curiae in support of Plaintiff-Appellant.

Roger J. Magnuson, Sarah M. Thier, Dorsey & Whitney LLP, Minneapolis, Minnesota, filed an amici brief for the Christian Film and Television Commission and the Industry Professionals and Professors in support of Plaintiff-Appellant.

J. Joshua Wheeler, Robert M. O'Neil, Charlottesville, Virginia; Donna R. Euben, Washington, D.C.; David M. Rabban, Austin, Texas, filed an amicus brief for The American Association of University Professors in support of Defendants-Appellees.

---

Before **SEYMOUR**, **HOLLOWAY**, and **EBEL**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

In 1998, Plaintiff Christina Axson-Flynn entered the University of Utah's Actor Training Program (ATP). Axson-Flynn, who is Mormon, refused to say the word "fuck" or take God's name in vain during classroom acting exercises. During Axson-Flynn's first semester in the program, Defendants—all ATP faculty members—told Axson-Flynn to "get over" her refusal to use those words, saying that not using the words would stunt her growth as an actor. Axson-Flynn did not "get over" her refusal to say the words and eventually left the ATP (and the University of Utah) before the end of her second semester; although never ordered to leave, she assumed that she would eventually be forced out.

Axson-Flynn then brought this action under 42 U.S.C. § 1983, claiming that Defendants had violated her free speech and free exercise rights under the First Amendment. She argued that requiring her to utter certain offensive words when performing a script constituted "compelled speech," and that not accommodating her religious beliefs violated her free exercise rights. The district court granted summary judgment to Defendants on both claims and found that they were also entitled to qualified immunity. Axson-Flynn filed a timely notice of appeal.

- 3 -

We take jurisdiction pursuant to 28 U.S.C. § 1291 and REVERSE and REMAND.

## BACKGROUND[1]

In 1998, Plaintiff-Appellant Christina Axson-Flynn ("Axson-Flynn"), a member of the Church of Jesus Christ of Latter-day Saints ("Mormon church"), applied to the University of Utah's Actor Training Program (ATP). As part of the application process, she attended an audition conducted by ATP instructors Barbara Smith, Sandy Shotwell, Jerry Gardner, and Sarah Shippobotham (hereinafter "Defendants"). During her audition, Sandy Shotwell asked Axson-Flynn if there was anything she would feel uncomfortable doing or saying as an actor. Axson-Flynn replied that she would not remove her clothing, "take the name of God in vain," "take the name of Christ in vain" or "say the four-letter expletive beginning with the letter F." Although the record is unclear as to whether Axson-Flynn explained at the time why she had those objections, the district court summarized her reasons as follows:

> [H]er refusal to use the words "God" or "Christ" as profanity is based on one of the Ten Commandments, which prohibits believers from taking "the name of the Lord thy God in vain . . . ." Exodus 20:8. Plaintiff has also explained that her refusal to say the word "fuck" is due to the fact that it is

---

[1]The district court noted that "[f]or the purposes of their summary judgment motion, Defendants have accepted Plaintiff's alleged facts as undisputed and therefore the court will recount the facts accordingly." Axson-Flynn v. Johnson, 151 F. Supp. 2d 1326, 1328 (D. Utah 2001). We do the same here.

- 4 -

religiously offensive to her because she finds that it vulgarizes what Plaintiff, as a Mormon, believes is a sacred act, appropriate only within the bounds of marriage.

Axson-Flynn v. Johnson, 151 F. Supp. 2d 1326, 1328 (D. Utah 2001).

At the audition, after challenging Axson-Flynn's refusal to say "fuck" by giving several examples of when it might be appropriate to do so, Defendant Shotwell asked Axson-Flynn, "Well, see, it isn't black and white, is it?" Axson-Flynn responded, "Well I guess not, and I guess it comes down to the individual actor. But as for myself, I will not say the F word, take the Lord's name in vain, or take off my clothes." Defendants then said "Thank you," and the audition ended. At one point during the exchange (the record is unclear as to exactly when), Axson-Flynn said, "I would rather not be admitted to your program than use these words" and "I will not use these words." Axson-Flynn later explained in her deposition that she did not ask Defendants if they understood her position, because "they're intelligent people. And I would assume that if you say: I will not do this, that they comprehend that. They're teachers."

Axson-Flynn was admitted to the ATP, and she matriculated in the fall of 1998. As part of a class exercise that fall, she was asked to perform a monologue called "Friday" that included two instances of the word "goddamn" and one

instance of the word "shit."[2]  Without informing her instructor (Defendant Barbara Smith), Axson-Flynn substituted other words for the two "goddamn"s but otherwise performed the monologue as written.  Smith did not notice, and Axson-Flynn received an "A" grade for her performance.

A few weeks later, as part of another class exercise, Smith asked Axson-Flynn to perform a scene from the play "The Quadrangle."  Axson-Flynn was to play the part of an unmarried girl who had recently had an abortion.  She expressed no concerns about the role itself.  She did, however, object to some of the words that she would be required to say, which included "goddamn" and "fucking."  Axson-Flynn mentioned her concerns to Smith, who asked why Axson-Flynn was raising these concerns now, when she apparently had no language concerns with respect to the "Friday" monologue.  Axson-Flynn replied that she had omitted the offensive words from the "Friday" monologue and that no one had noticed.  Smith became angry, told Axson-Flynn her behavior was unacceptable, and said that Axson-Flynn would have to "get over" her language concerns.  She told Axson-Flynn that she could "still be a good Mormon and say these words."  Axson-Flynn offered to perform a different scene if she were not allowed to change or omit the offensive words, but Smith refused to allow that,

---

[2]Axson-Flynn had no religious objections to saying the word "shit."  Her objections appear to be limited to the word "fuck" and to the words "goddamn" and its variants.

- 6 -

saying that Axson-Flynn would either perform the "Quadrangle" scene as written or receive a grade of zero on the exercise. If Axson-Flynn received a zero, the highest grade she would have been able to receive in the class would have been a "C." Axson-Flynn said that she would take a zero on that and any other assignment she could not complete due to her language concerns. Smith suggested that before making such a decision, Axson-Flynn should take the weekend and think about it, which Axson-Flynn agreed to do.

Shortly thereafter (the record is not clear as to when), Smith asked Axson-Flynn if she had changed her mind. Axson-Flynn replied that she had not, and that she would accept a zero. Smith then relented, telling Axson-Flynn that she "admire[d] [her] character" and that she would be allowed "to omit the language that [wa]s offensive" to her. Axson-Flynn performed the scene from "The Quadrangle" without the offensive language and received a high grade on her performance. For the rest of the semester, Axson-Flynn was allowed to omit any language she found offensive during class exercises. Axson-Flynn, 151 F. Supp. 2d at 1329.

At the end of the fall semester, Axson-Flynn attended her semester review, at which Defendants Barbara Smith, Sarah Shippobotham, and Sandy Shotwell were present. Defendants confronted Axson-Flynn about her language concerns and said that her request for an accommodation was "unacceptable behavior."

They recommended that she "talk to some other Mormon girls who are good Mormons, who don't have a problem with this." Finally, they told her, "You can choose to continue in the program if you modify your values. If you don't, you can leave. That's your choice." After the review, Axson-Flynn appealed for help to Defendant Xan Johnson, the ATP's coordinator, but Johnson told her that he supported the other Defendants' position on the language issue. Axson-Flynn, 151 F. Supp. 2d at 1329.

As Axson-Flynn began her second semester in January of 1999, Defendants continued to pressure her frequently to use the language that she found offensive. To clarify the ATP's position on the language issue, Axson-Flynn went to Sandy Shotwell, the director of the ATP. She said to Shotwell, "Sandy, this is what I understand. If I do not—and this is what you said—modify my values by the end of the semester, I'm going to have to find another program. Is that right?" Shotwell replied, "Well, yes. We talked about that, yes." Axson-Flynn told Shotwell that she did not want to leave but that she was not going to change her mind. Shotwell replied, "Neither are we."

Later that month, Axson-Flynn decided to withdraw from the ATP and leave the University of Utah. While she had never been asked to leave, she nonetheless apparently believed that it was only a matter of time before that would happen. Axson-Flynn, 151 F. Supp. 2d at 1329. After Axson-Flynn left

the University of Utah, she enrolled in the acting program at Utah Valley State College. At Utah Valley State, Axson-Flynn was allowed to omit the language she found offensive.

On February 16, 2000, Axson-Flynn filed suit against Defendants pursuant to 42 U.S.C. § 1983 for violating her free speech and free exercise rights under the First Amendment. She sought both monetary damages and declaratory relief in the form of a statement that Defendants had violated her constitutional rights. She also made nonspecific requests for "equitable relief for improper interference" with her constitutional rights and "[f]or such other and further relief as the court deems just in the premises." Defendants moved for summary judgment both on the merits and on the basis of qualified immunity. The district court granted Defendants' motion for summary judgment, finding no constitutional violations, and finding that in any event, defendants would be entitled to qualified immunity on both claims. <u>Axson-Flynn</u>, 151 F. Supp. 2d at 1342. Axson-Flynn timely filed this appeal.

## DISCUSSION

As noted above, Axson-Flynn raises two constitutional challenges to Defendants' insistence that she utter the words she finds offensive. First, she argues that forcing her to say the offensive words constitutes an effort to compel

her to speak, in violation of the First Amendment's free speech clause. Second, she argues that forcing her to say the offensive words, the utterance of which she considers a sin, violates the First Amendment's free exercise clause. We address each of these arguments in turn and find that the record reveals material issues of fact as to both Axson-Flynn's free speech claim and her free exercise claim.

## I. FREEDOM OF SPEECH

Axson-Flynn argues that Defendants' insistence that she speak her lines as written, without omitting the words she found offensive, violated her First Amendment right to refrain from speaking.[3] The district court rejected this argument and granted summary judgment to Defendants, finding that what Axson-Flynn was being asked to do fell outside the bounds of the Supreme Court precedents that prohibit compelled speech. Axson-Flynn, 151 F. Supp. 2d at 1336.

We review de novo the district court's grant of summary judgment. Phelan v. Laramie County Cmty. Coll. Bd. of Trs., 235 F.3d 1243, 1246 (10th Cir. 2000).

---

[3]The First Amendment's free speech clause states that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. The free speech clause applies to the states through the due process clause of the Fourteenth Amendment. See, e.g., Gitlow v. New York, 268 U.S. 652, 666 (1925).

When reviewing a decision that implicates First Amendment freedoms, "an appellate court has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." Id. (internal citations and quotation marks omitted). For the reasons that follow, we reverse the district court's grant of summary judgment and remand for further proceedings.

The Supreme Court has long held that the government may not compel the speech of private actors. See United States v. United Foods, Inc., 533 U.S. 405, 413-15 (2001); Wooley v. Maynard, 430 U.S. 705, 714-15 (1977); W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 642 (1943).[4] Moreover, it is apodictic

---

[4]The district court misinterpreted these compelled speech cases. Relying on Barnette and Wooley, the district court reasoned that the First Amendment proscription of forced speech did not apply to Axson-Flynn's case because unlike the plaintiffs in those cases, Axson-Flynn was not being required to "espouse an ideological point of view on behalf of the State." Axson-Flynn, 151 F. Supp. 2d at 1335. That reasoning is incorrect.

In general, First Amendment protection does not hinge on the ideological nature of the speech involved. See Schad v. Borough of Mount Ephraim, 452 U.S. 61, 65 (1981) ("Entertainment, as well as political and ideological speech, is protected"). Likewise, the First Amendment's proscription of compelled speech does not turn on the ideological content of the message that the speaker is being forced to carry. The constitutional harm—and what the First Amendment prohibits—is being forced to speak rather than to remain silent. See Wooley, 430 U.S. at 714 ("[T]he right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all."); Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc., 515 U.S. 557, 573 (1995) ("[O]ne important manifestation of the principle of free speech is that one who chooses to speak may also decide

(continued...)

- 11 -

that public school students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 506 (1969). At the same time, however, the Court has emphasized that "the First Amendment rights of students in the public schools are not automatically coextensive with the rights of adults in other settings, and must be applied in light of the special characteristics of the school environment." Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 266 (1988) (internal quotation marks and citations omitted). Nowhere is this more true than

[4](...continued)
'what not to say'"). This harm occurs regardless of whether the speech is ideological. See, e.g., United States v. United Foods,Inc., 533 U.S. 405, 411 (2001) (holding that regulations forcing mushroom producers to fund generic advertising violated the First Amendment, even though they "[did] not compel the expression of political or ideological views"); Riley v. Nat'l Fed'n of the Blind, 487 U.S. 781, 796-98 (1988) ("There is certainly some difference between compelled speech and compelled silence, but in the context of protected speech, the difference is without constitutional significance, for the First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what not to say. . . . These cases cannot be distinguished simply because they involved compelled statements of opinion [rather than] compelled statements of 'fact': either form of compulsion burdens protected speech."); Cable Ala. Corp. v. City of Huntsville, 768 F. Supp. 1484, 1504 n.28 (N.D. Ala. 1991) ("[T]he defendants argue that Wooley and other cases concerning the First Amendment right to refrain from speaking are limited to efforts by the government to compel 'ideological' speech. The First Amendment is not so limited. Any governmental regulation of the right not to speak must comport with the requirements of the United States Constitution."). Moreover, it is difficult to imagine a standard by which a court could determine whether non-commercial speech is or is not ideological.

in the context of a school's right to determine what to teach and how to teach it in its classrooms.[5]

At the outset, we must determine whether the ATP's classroom should be considered a traditional public forum, designated public forum, or nonpublic forum for free speech purposes. As the Hazelwood Court stated, "public schools do not possess all of the attributes of streets, parks, and other traditional public forums that 'time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" Id. at 267 (quoting Hague v. CIO, 307 U.S. 496, 515 (1939)). Nothing in the record leads us to conclude that under that standard, the ATP's classroom could reasonably be considered a traditional public forum. Neither could the classroom be considered a designated public forum, as there is no indication in the record

---

[5]The Tenth Circuit has had little occasion to address the contours of the compelled speech doctrine in a context like the one at hand. The only case in our Circuit raising a compelled speech claim in the context of a public school's curricular decisions is Bauchman v. West High Sch., 132 F.3d 542 (10th Cir. 1997). In Bauchman, a Jewish student sued her high school (and various other defendants) on free speech and free exercise grounds for, inter alia, requiring her to sing religious songs as part of her membership in a school choir. The court rejected Bauchman's compelled speech claim because there was no evidence that she was actually compelled to sing the religious songs. Id. at 558. Indeed, Bauchman was specifically "given the option of not participating to the extent such participation conflicted with her religious beliefs" and "was assured her Choir grade would not be affected by any limited participation." Id. at 557. Because Bauchman had failed to establish a "threshold element" of compulsion, the court upheld the district court's dismissal of her claim. Due precisely to the lack of compulsion present in Bauchman, it is of little use to our analysis here.

that "school authorities have 'by policy or by practice' opened [the classroom] 'for indiscriminate use by the general public,' or by some segment of the public, such as student organizations." Id. at 267 (quoting Perry Education Assn. v. Perry Local Educators' Assn., 460 U.S. 37, 46 n.7, 47 (1983)). We thus find that the ATP's classroom constitutes a nonpublic forum, meaning that school officials could regulate the speech that takes place there "in any reasonable manner." Id. at 270.

We next turn to the type of speech at issue in this case. There are three main types of speech that occur within a school setting. Fleming v. Jefferson County Sch. Dist. R-1, 298 F.3d 918, 923 (10th Cir. 2002). First is student speech that "happens to occur on the school premises," such as the black armbands worn by the students in Tinker. Id. This type of speech comprises "pure student expression that a school must tolerate unless it can reasonably forecast that the expression will lead to 'substantial disruption of or material interference with school activities.'" Id. (quoting Tinker, 393 U.S. at 514). The speech at issue in the instant case clearly is not of this type, as it occurred in the classroom setting in the context of a class exercise and did not simply "happen[] to occur on the school premises." See id.

The second type of speech in the school setting is "government speech, such as the principal speaking at a school assembly." Id. Axson-Flynn is a

- 14 -

student, not a school official, and recitation of the play is not being advanced as government speech. Therefore, this speech does not fit into this category either.

The third type of speech is "school-sponsored speech," which is "speech that a school 'affirmatively . . . promotes,' as opposed to speech that it 'tolerates.'" Id. (quoting Hazelwood, 484 U.S. at 270–71). "'Expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school' constitute school-sponsored speech, over which the school may exercise editorial control, 'so long as [its] actions are reasonably related to legitimate pedagogical concerns.'" Id. (quoting Hazelwood, 484 U.S. at 271, 273). We conclude that Axson-Flynn's speech in this case constitutes "school-sponsored speech" and is thus governed by Hazelwood.

In Hazelwood, the Supreme Court upheld against a free speech challenge a school's decision to excise two pages from the school newspaper because of content it deemed inappropriate for publication. The Court determined that the newspaper, which was published as part of a journalism class, constituted "school-sponsored" speech—speech that a school "affirmatively . . . promote[s]," as opposed to speech that it merely "tolerate[s]." Hazelwood, 484 U.S. at 270–71. School-sponsored speech comprises "expressive activities" that "may fairly be characterized as part of the school curriculum, whether or not they occur in a traditional classroom setting, so long as they are supervised by faculty

members and designed to impart particular knowledge or skills to student participants and audiences." Id. at 271. Because the newspaper was "part of the school curriculum," it was school-sponsored speech. The Court held that school officials may place restrictions on school-sponsored speech "so long as their actions are reasonably related to legitimate pedagogical concerns." Id. at 273. The Court then proceeded to find that the school's reasons for excising the two newspaper pages met that standard and that its decision to do so should be upheld. Id. at 276.

In Fleming, we held that a school project which involved the painting of four-inch-by-four-inch tiles that would be permanently affixed to the school's hallways constituted "school-sponsored speech" under Hazelwood. Fleming, 298 F.3d at 920-21, 924. We stated that "[t]he imprimatur concept covers speech that is so closely connected to the school that it appears the school is somehow sponsoring the speech." Id. at 925. The "pedagogical" concept merely means that the activity is "related to learning." Id.

Here, there is no doubt that the school sponsored the use of plays with the offending language in them as part of its instructional technique. The particular plays containing such language were specifically chosen by the school and incorporated as part of the school's official curriculum. Furthermore, if a school newspaper and a project to paint and post glazed and fired tiles in a school

- 16 -

hallway can be considered school-sponsored speech, then surely student speech that takes place inside the classroom, as part of a class assignment, can also be considered school-sponsored speech. See Fleming, 298 F.3d at 925 ("We think that the Court's language that activities are 'school-sponsored' speech if they are 'designed to impart particular knowledge or skills to student participants and audiences,' means activities that affect learning, or in other words, affect pedagogical concerns.") (quoting Hazelwood, 484 U.S. at 271) (citation omitted); see also Hazelwood, 484 U.S. at 271 (listing theatrical productions that are part of the school curriculum as an example of school-sponsored speech).

Our conclusion that speech which is prescribed as part of the official school curriculum in connection with a classroom exercise is school-sponsored speech is bolstered by the conclusions that other circuits have reached in this context.[6] In Settle v. Dickson County Sch. Bd., 53 F.3d 152 (6th Cir. 1995), a ninth grade teacher refused to permit one of her students to write a required research paper on Jesus Christ. Id. at 153–54. The teacher said that she would accept a paper on religion, as long as the paper "did not deal solely with Christianity or the Life of

_____

[6]We acknowledge that some circuits have cast doubt on the application of Hazelwood in the context of university extracurricular activities. See e.g., Kincaid v. Gibson, 236 F.3d 342, 346 n.5 (6th Cir. 2001); Student Gov't. Ass'n. v. Bd. of Trs. of Univ. of Mass., 868 F.2d 473, 480 n.6 (1st Cir. 1989). However, because Axson-Flynn's speech occurred as part of a curricular assignment during class time and in the classroom, we need not reach any analysis of university students' extracurricular speech.

Christ." Id. at 154. Among the teacher's reasons for this decision were the

student's failure to follow the required procedure to propose a paper topic; the

teacher's concern that the proposed paper would be difficult to evaluate because

of the student's strong personal beliefs; and the teacher's concern that because the

student already knew a great deal about Jesus Christ, allowing her to write a paper

about Jesus Christ would defeat the research-oriented purpose of the exercise. Id.

When the student refused to comply with the teacher's condition, she received a

zero on the assignment. She then sued the teacher and the school board for

violating her free speech rights under the First Amendment. Id. at 153, 155.

The Sixth Circuit applied a Hazelwood analysis and rejected the student's

free speech challenge by affirming the grant of summary judgment to the

defendants. The court reasoned:

> <u>Where learning is the focus, as in the classroom, student speech may be
> even more circumscribed than in the school newspaper or other open forum.</u>
> So long as the teacher limits speech or grades speech in the classroom in
> the name of learning and not as a pretext for punishing the student for her
> race, gender, economic class, religion or political persuasion, the federal
> courts should not interfere.
>
> Like judges, teachers should not punish or reward people on the basis of
> inadmissible factors—race, religion, gender, political ideology—but
> teachers, like judges, must daily decide which arguments are relevant,
> which computations are correct, which analogies are good or bad, and when
> it is time to stop writing or talking. <u>Grades must be given by teachers in
> the classroom, just as cases are decided in the courtroom; and to this end
> teachers, like judges, must direct the content of speech.</u> Teachers may
> frequently make mistakes in grading and otherwise, just as we do
> sometimes in deciding cases, but <u>it is the essence of the teacher's</u>

responsibility in the classroom to draw lines and make distinctions—in a word to encourage speech germane to the topic at hand and discourage speech unlikely to shed light on the subject. Teachers therefore must be given broad discretion to give grades and conduct class discussion based on the content of speech. . . . It is not for us to overrule the teacher's view that the student should learn to write research papers by beginning with a topic other than her own theology.

Id. at 155-56 (emphasis added).[7]

Brown v. Li, 308 F.3d 939 (9th Cir. 2002), arose from university student Christopher Brown's decision to attach a "Disacknowledgements" section to the end of his master's degree thesis. The section began, "I would like to offer special *Fuck You's* to the following degenerates for being an ever-present hindrance during my graduate career. . . ." Id. at 943. It then named, among

---

[7]Judge Batchelder, concurring only in the judgment, argued that the First Amendment was not implicated at all by the teacher's actions. While she acknowledged that "a balance must be struck between a student's right to freedom of expression in the classroom and a teacher's right to control and manage that classroom," Settle, 53 F.3d at 156, Judge Batchelder concluded that no such balance was required in this case:

This case is not about Brittney Settle's First Amendment right to express her views, opinions or beliefs, religious or otherwise, in the classroom. This case is about whether Brittney's ninth-grade English teacher may determine what topic is appropriate to satisfy a research paper assignment in that class. . . .

The bottom line is that when a teacher makes an assignment, even if she does it poorly, the student has no constitutional right to do something other than that assignment and receive credit for it. It is not necessary to try to cram this situation into the framework of constitutional precedent, because there is no constitutional question.

Id. at 157, 158.

- 19 -

others, the dean and staff of the student's graduate school, the managers of the university library, and a former California governor. Id. Due to the inclusion of this section, Brown's thesis committee declined to approve his thesis, and he was eventually placed on academic probation for failing to complete his degree within the allotted time. Id. at 944–45. After four months of probation, the university relented and awarded Brown his degree based on his earlier submission of a copy of his thesis that had not included the "Disacknowledgements" section. Id. at 945. However, because Brown had not submitted the approved version of his thesis to the university library, it was never added to the library's archive of theses. Id. As a result, Brown filed suit alleging, inter alia, that the defendants' initial withholding of his degree violated his free speech rights under the First Amendment. Among other remedies, Brown sought an injunction compelling the defendants to place his thesis in the university's library. The district court granted the defendants' motion for summary judgment on all counts, and the Ninth Circuit affirmed.

The Ninth Circuit framed the First Amendment question as "whether Defendants violated Plaintiff's First Amendment rights when they refused to approve that ["Disacknowledgements"] section." Id. at 947. After acknowledging that there was "no precedent precisely on point," the court began

its First Amendment analysis by discussing <u>Hazelwood</u> and <u>Settle</u>.  <u>Id.</u> at 947–49.

The court reasoned that those two cases

> lead to the conclusion that an educator can, consistent with the First Amendment, require that a student comply with the terms of an academic assignment.  <u>Those cases also make clear that the First Amendment does not require an educator to change the assignment to suit the student's opinion</u> or to approve the work of a student that, in his or her judgment, fails to meet a legitimate academic standard. Rather, as articulated by <u>Hazelwood</u>, "educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns."

<u>Id.</u> at 949 (quoting <u>Hazelwood,</u> 484 U.S. at 273).

The court acknowledged that <u>Hazelwood</u> explicitly "left open the question 'whether the same degree of deference is appropriate with respect to school sponsored expressive activities at the college and university level.'" <u>Id.</u> (quoting <u>Hazelwood</u>, 484 U.S. at 273 n.7).  However, the <u>Brown</u> court concluded that, at least as to curriculum issues, as opposed to extracurricular activities, <u>Hazelwood</u> provided a good framework for evaluating free speech claims even at the college level.  <u>Id.</u> at 950-51.  The court concluded that

> under the Supreme Court's precedents, the curriculum of a public educational institution is one means by which the institution itself expresses its policy, a policy with which others do not have a constitutional right to interfere.  The Supreme Court's jurisprudence does not hold that an institution's interest in mandating its curriculum and in limiting a student's speech to that which is germane to a particular academic assignment diminishes as students age.  Indeed, arguably the need for academic discipline and editorial rigor increases as a student's learning progresses.

Id. at 951 (citation and emphasis omitted).

Similarly, the Eleventh Circuit applied Hazelwood in the context of university curricular speech in Bishop v. Aronov, 926 F.2d 1066 (11th Cir. 1991). There, the court held that the university's restriction of a professor's[8] in-class curricular speech was reasonably related to legitimate pedagogical goals. The court explained, "As a place of schooling with a teaching mission, we consider the University's authority to reasonably control the content of its curriculum, particularly that content imparted during class time." Id. at 1074.

The Bishop court recognized that Hazelwood is most often applied in the context of secondary schools. Id. "Yet, insofar as it covers the extent to which an institution may limit in-school expressions which suggest the school's approval, we adopt the [Hazelwood] Court's reasoning as suitable to our ends,

---

[8]Although Bishop involved professorial speech, and the speech at issue in this case is that of a student, the case is still relevant for its application of Hazelwood to university curricular speech. In Roberts v. Madigan, 921 F.2d 1047, 1057 (10th Cir. 1990), this Court stated that it found, under Tinker and Hazelwood, "no reason here to draw a distinction between teachers and students where classroom expression is concerned." Additionally, we applied Hazelwood to the in-class curricular speech of a high school teacher in Miles v. Denver Pub. Schs., 944 F.2d 773, 776 (10th Cir. 1991), because "a teacher's expression in the 'traditional classroom setting' also bears the imprimatur of the school." We emphasized that a "school's interests in regulating classroom speech . . . are implicated regardless of whether that speech comes from a teacher or student." Id. at 777. In the case at hand, we need not address the nuances in difference between teacher adherence to academic curriculum established by the school and other academic speech in which teachers engage. Cf. Silva v. Univ. of N.H., 888 F. Supp. 293, 313-14 (D. N.H. 1994).

even at the university level." Id. The court emphasized that educational institutions have traditionally exercised greater control over curriculum than over extracurricular activities. Id. at 1075 (citing Virgil v. Sch. Bd. of Columbia County, 862 F.2d 1517, 1520 (11th Cir. 1989) ("In matters pertaining to the curriculum, educators have been accorded greater control over expression than they may enjoy in other spheres of activity.")).

We find the reasoning of the Settle, Brown, and Bishop courts persuasive. Few activities bear a school's "imprimatur" and "involve pedagogical interests," Fleming, 298 F.3d at 924, more significantly than speech that occurs within a classroom setting as part of a school's curriculum. See Miles v. Denver Pub. Schs., 944 F.2d 773, 776 (10th Cir. 1991). Accordingly, we hold that the Hazelwood framework is applicable in a university setting for speech that occurs in a classroom as part of a class curriculum. Cf. Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 833 (1995) ("When the University determines the content of the education it provides, it is the University speaking, and we have permitted the government to regulate the content of what is or is not expressed. . ."); Id. at 834 (citing Hazelwood as an example of the "principles" that govern a university's restriction of its own speech). Although we are applying Hazelwood to a university context, we are not unmindful of the differences in maturity between university and high school students. Age,

maturity, and sophistication level of the students will be factored in determining whether the restriction is "reasonably related to legitimate pedagogical concerns." See Ward v. Hickey, 996 F.2d 448, 453 (1st Cir. 1993) ("[W]hether a regulation is reasonably related to legitimate pedagogical concerns will depend on, among other things, the age and sophistication of the students, the relationship between teaching method and valid educational objective, and the context and manner of the presentation").

Axson-Flynn argues that forcing her, as part of an acting-class exercise, to say words she finds offensive constitutes compelled speech in violation of the First Amendment. "In order to compel the exercise or suppression of speech, the governmental measure must punish, or threaten to punish, protected speech by governmental action that is 'regulatory, proscriptive, or compulsory in nature.'" Phelan, 235 F.3d at 1247 (quoting Laird v. Tatum, 408 U.S. 1, 11 (1972)). Compulsion need not take the form of a direct threat or a gun to the head. "The consequence may be an 'indirect discouragement,' rather than a direct punishment, such as 'imprisonment, fines, injunctions or taxes.'" Id. (quoting Am. Communications Ass'n v. Douds, 339 U.S. 382, 402 (1950)). There is no question that in the instant case, Defendants attempted to compel Axson-Flynn to speak. Although they never suspended her from the ATP or explicitly threatened her with expulsion, Defendants made it abundantly clear that Axson-Flynn would

not be able to continue in the program if she refused to say the words with which she was uncomfortable.

As we have noted earlier, because the speech was to take place in the classroom context as part of a mandated school curriculum, it clearly bore the school's "imprimatur" and "involve[d] pedagogical interests." Fleming, 298 F.3d at 924. As such, it is school-sponsored speech. Thus, we will uphold the ATP's decision to restrict (or compel) that speech as long as the ATP's decision was "'reasonably related to legitimate pedagogical concerns.'" Id. at 926 (quoting Hazelwood, 484 U.S. at 273).[9] We give "substantial deference" to "educators' stated pedagogical concerns." Id. at 925.

That schools must be empowered at times to restrict the speech of their students for pedagogical purposes is not a controversial proposition. By no means is such power limited to the very basic level of a teacher's ability to penalize a student for disruptive classroom behavior. For example,

> [s]chools routinely deny students the ability to express themselves by adopting the words of others. A student told to submit an essay about the nineteenth century Russian novel could not fulfil the obligation by assuring

---

[9]For First Amendment purposes, it is irrelevant whether the speech at issue here was restricted or compelled. See Riley v. Nat'l Fed'n of the Blind, 487 U.S. 781, 796–97 (1988) ("There is certainly some difference between compelled speech and compelled silence, but in the context of protected speech, the difference is without constitutional significance, for the First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what not to say.").

his teacher that he agrees with George Steiner's <u>Tolstoy or Dostoevsky: An Essay in the Old Criticism</u> (1959)—could not do so even if he turned in a brand new, store-bought copy, avoiding any charge of plagiarism or violation of the copyright laws.

<u>Hedges v. Wauconda Cmmty. Unit Sch. Dist. No. 118</u>, 9 F.3d 1295, 1302 (7th Cir. 1993). By the same token, schools also routinely require students to express a viewpoint that is not their own in order to teach the students to think critically:

> For example, a college history teacher may demand a paper defending Prohibition, and a law-school professor may assign students to write "opinions" showing how Justices Ginsburg and Scalia would analyze a particular Fourth Amendment question. . . . Such requirements are part of the teachers' curricular mission to encourage critical thinking (in the hypothetical examples) and to conform to professional norms (in this case).

<u>Brown</u>, 308 F.3d at 953 (concluding that a thesis committee at a university is entitled under <u>Hazelwood</u> to put limits on what may be included in the acknowledgments section of a master's thesis); <u>see also</u> <u>Fleming</u>, 298 F.3d at 926 ("[W]e conclude that <u>Hazelwood</u> allows educators to make viewpoint-based decisions about school-sponsored speech."); <u>cf.</u> <u>Board of Regents v. Southworth</u>, 529 U.S. 217, 242–43 (2000) (Souter, J., concurring in the judgment) (noting that at a university, "students are inevitably required to support the expression of personally offensive viewpoints in ways that cannot be thought constitutionally objectionable unless one is prepared to deny the University its choice over what to teach."). Student speech in the classroom context is thus restricted every day in a variety of ways, few of which would be deemed controversial.

In the instant case, Defendants justified their restriction on speech—the requirement that students, including Axson-Flynn, perform the acting exercises as written—as a methodology for preparing students for careers in professional acting. Defendants argue that requiring students to perform offensive scripts advances the school's pedagogical interest in teaching acting in at least three ways: (1) it teaches students how to step outside their own values and character by forcing them to assume a very foreign character and to recite offensive dialogue;[10] (2) it teaches students to preserve the integrity of the author's work;[11]

[10]Smith specifically pointed out that the purpose behind these "required performances" was to "teach students how to approach representing characters with whom they might have little in common." For example, the "Friday" monologue gave students "the opportunity to create a character, for example the person may choose to portray a hardened criminal, a drop out or someone dying." Shotwell similarly explained that the "use of particular language can define characters and emotions" and certain curse words can be "central to [characters'] communication" and can "illustrate[] their personal dialect." Defendants argued that these texts were chosen because they "challenge students with characters and stories that might be quite different from their own life experiences. Thus, playing a hardened working class character, as in the 'Friday' monologue, or a college student dealing with extramarital sex and an abortion, as in The Quadrangle, encourages students to separate themselves from their characters and to begin to learn how to portray characters substantially different from themselves." Defendants continued, "The first year acting class introduces aspiring actors to the fact that acting like another person will require them to say and do things that they themselves might not normally say and do." They stated that they use text with often offensive language as a "teaching tool" for these pedagogical purposes.

[11]In Plaintiff's initial interview, Shotwell explained the importance of appreciating a work of art as a whole: "If you like a piece of art, but you don't like one piece of it, do you cut out that piece and hang it on the wall with a hole
(continued...)

- 27 -

and (3) it measures true acting skills to be able convincingly to portray an offensive part.[12] Requiring an acting student, in the context of a classroom exercise, to speak the words of a script as written is no different than requiring that a law or history student argue a position with which he disagrees.[13] See Brown, 308 F.3d at 953. Both types of restriction on student speech, if not pretextual, can meet the Hazelwood standard, which "does not require that the [restrictions] be the most reasonable or the only reasonable limitations, only that they be reasonable." Fleming, 298 F.3d at 932 (internal quotation marks omitted).

---

[11](...continued)
in it? Or do you enjoy art as a whole and just accept what you don't like about it."

[12]Smith explained that "an actor's ability to believably portray a character significantly different from herself is a measure of excellence."

[13]The religious nature of Axson-Flynn's refusal to say the offensive words is not determinative of our disposition of her free speech claim. The Supreme Court has never held that religious speech is entitled to more protection than non-religious speech. See Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. 753, 760 (1995) ("Our precedent establishes that private religious speech, far from being a First Amendment orphan, is as fully protected under the Free Speech Clause as secular private expression.") (emphasis added); see also id. at 766 ("Of course, giving sectarian religious speech preferential access to a forum close to the seat of government (or anywhere else for that matter) would violate the Establishment Clause (as well as the Free Speech Clause, since it would involve content discrimination).") (plurality); Rosenberger, 515 U.S. at 846 (O'Connor, J., concurring) ("We have time and again held that the government generally may not treat people differently based on the God or gods they worship, or do not worship.") (quotation marks and citation omitted); Kreisner v. City of San Diego, 1 F.3d 775, 790 (9th Cir. 1993) (Kozinski, J., concurring) ("Religious speech is speech, entitled to exactly the same protection from government restriction as any other kind of speech—no more and no less.").

The school's methodology may not be <u>necessary</u> to the achievement of its goals and it may not even be the most effective means of teaching, but it can still be "reasonably related" to pedagogical concerns. A more stringent standard would effectively give each student veto power over curricular requirements, subjecting the curricular decisions of teachers to the whims of what a particular student does or does not feel like learning on a given day. This we decline to do.

Although we do not second-guess the <u>pedagogical</u> wisdom or efficacy of an educator's goal,[14] we would be abdicating our judicial duty if we failed to

_____

[14] We are sympathetic to the argument of amici Industry Professionals and Professors that it is not unusual in the field of professional acting for actors to request script modifications. However, the Supreme Court has cautioned against federal courts second-guessing the <u>pedagogical</u> legitimacy or efficacy of educators' chosen methodologies. See e.g., Regents of the Univ. of Mich. v. Ewing, 474 U.S. 214, 225 (1985) ("When judges are asked to review the substance of a genuinely academic decision, such as this one, they should show great respect for the faculty's professional judgment."); Board of Curators of the Univ. of Mo. v. Horowitz, 435 U.S. 78, 90 (1978) ("Like the decision of an individual professor as to the proper grade for a student in his course, the determination whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decisionmaking."); Wood v. Strickland, 420 U.S. 308, 326 (1975) ("It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion"). See also Canady v. Bossier Parish Sch. Bd., 240 F.3d 437, 444 (5th Cir. 2001) ("[I]t is not the job of federal courts to determine the most effective way to educate our nation's youth."); West v. Derby Unified Sch. Dist. No. 260, 206 F.3d 1358, 1363 (10th Cir. 2000) ("[W]e reaffirm the principle that 'judicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint. . . . By and large, public education in our Nation is committed to the control of state and local authorities.'") (quoting Epperson v. Arkansas, 393 U.S. 97, 104 (1968)) (ellipses

(continued...)

investigate whether the educational goal or pedagogical concern was <u>pretextual</u>. In <u>Regents of the Univ. of Mich. v. Ewing</u>, 474 U.S. 214, 225 (1985), the Supreme Court directed courts not to override a faculty member's professional judgment "unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." Thus, we may override an educator's judgment where the proffered goal or methodology was a sham pretext for an impermissible ulterior motive. <u>See</u> <u>also</u> <u>Settle</u>, 53 F.3d at 155-56 ("So long as the teacher limits speech or grades speech in the classroom in the name of learning and not as a pretext for punishing the student for her race, gender, economic class, religion or political persuasion, the federal courts should not interfere.").

In her amended complaint, Axson-Flynn posits that Defendants forced her to adhere strictly to the script not because of their educational goals as described

---

[14](...continued)
in original); <u>Hedges</u>, 9 F.3d at 1301 ("The Constitution is not a code of education, requiring schools to adopt whatever practices judges believe will promote learning.").

In their pleadings, Defendants rely on the ill-defined right of "academic freedom" when they reference this principle of judicial restraint in reviewing academic decisions. Although we recognize and apply this principle in our analysis, we do not view it as constituting a separate right apart from the operation of the First Amendment within the university setting. <u>See</u> Rebecca Gose Lynch, Note, *Pawns of the State or Priests of Democracy? Analyzing Professors' Academic Freedom Rights Within the State's Managerial Realm*, 91 CAL. L. REV. 1061, 1096 (2003) ("[A]cademic freedom is not a special right but rather the result of a functional application of the First Amendment in the context of a particular governmental institution [– the university].").

above, but rather because of "anti-Mormon sentiment." During her deposition, she queried, "They respect other kids' freedom of religion that aren't [Mormon]. Why won't they respect mine?" Additionally, the program's insistence that Axson-Flynn speak with other "good Mormon girls" and that she could "still be a good Mormon" and say these words certainly raises concern that hostility to her faith rather than a pedagogical interest in her growth as an actress was at stake in Defendants' behavior in this case. Viewing the evidence in a light most favorable to Axson-Flynn, we find that there is a genuine issue of material fact as to whether Defendants' justification for the script adherence requirement was truly pedagogical or whether it was a pretext for religious discrimination. Therefore, summary judgment was improper.

For the foregoing reasons, we REVERSE the district court's grant of summary judgment in favor of Defendants on the free speech claim, and REMAND for further proceedings.

## II. FREE EXERCISE

Axson-Flynn also argues that by attempting to force her to say words whose utterance would violate her religious beliefs, Defendants violated the free

exercise clause of the First Amendment.[15]   The district court rejected this

argument and granted summary judgment to Defendants.[16]  Axson-Flynn, 151 F.

Supp. 2d at 1334, 1341.  We review that decision de novo, see Phelan, 235 F.3d at

1246, and reverse the decision of the district court.

"Depending on the nature of the challenged law or government action, a

free exercise claim can prompt either strict scrutiny or rational basis review."

Tenafly Eruv Ass'n., Inc. v. Borough of Tenafly, 309 F.3d 144, 165 (3d Cir.

2002) (discussing Church of Lukumi Babalu Aye, Inc. v. City of Hialeah, 508

U.S. 520, 532, 542 (1993), and Employment Div. v. Smith, 494 U.S. 872, 879

---

[15]The free exercise clause states that "Congress shall make no law . . . prohibiting the free exercise [of religion]."  U.S. Const., amend I.  The free exercise clause applies to the states through the Fourteenth Amendment's due process clause.  See, e.g., Cantwell v. Connecticut, 310 U.S. 296, 303–04 (1940).

[16]The district court first held that Defendants' performance requirement was neutral and of general applicability, thus requiring Axson-Flynn to demonstrate that the curricula had as its purpose the suppression of religion.  Axson-Flynn, 151 F. Supp. 2d at 1331.  The court reasoned that Axson-Flynn did not allege such ulterior motives and thus held that her free exercise claim would fail unless she met either of the two exceptions to this bright line rule.  Id. at 1331-32; see Employment Div. v. Smith, 494 U.S. 872 (1990) (discussing an "individualized exemption" exception and a "hybrid-rights" exception).  The court held that she did not meet the "individualized exemption" exception because the ATP rules themselves did not explicitly provide for exemptions.  Id. at 1333.  The court additionally held that she did not meet the "hybrid-rights" exception because although her claim was "non-frivolous" (and thus "colorable"), Defendants satisfied what the district court concluded was an intermediate level of scrutiny requiring a "more than reasonable relationship" with Defendants' educational goals.  Id. at 1341.

- 32 -

(1990)). Thus, our first step in analyzing Axson-Flynn's claim is to determine which level of scrutiny to apply.

Neutral rules[17] of general applicability ordinarily do not raise free exercise concerns even if they incidentally burden a particular religious practice or belief. Church of Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 531 (1993); Employment Div. v. Smith, 494 U.S. 872, 879 (1990). When it comes to the enforcement of such rules, "the Free Exercise Clause offers no protection." Tenafly, 309 F.3d at 165 (citing Smith, 494 U.S. at 879); see also United States v. Hardman, 297 F.3d 1116, 1126 (10th Cir. 2002) ("In effect, Smith creates a 'safe harbor'—if the law is 'a valid and neutral law of general applicability,' then it must simply be rationally related to a legitimate government end."). By contrast, if a law that burdens a religious practice or belief is not neutral or generally applicable, it is subject to strict scrutiny, and "the burden on religious conduct violates the Free Exercise Clause unless it is narrowly tailored to advance a compelling government interest." Tenafly, 309 F.3d at 165 (citing Church of Lukumi Babalu Aye, 508 U.S. at 532, 542).

We first address the threshold requirement of Smith of determining whether the strict adherence to offensive script requirement was a "neutral rule of general applicability." A rule that is discriminatorily motivated and applied is not a

_____

[17]For the sake of simplicity, we use the word "rules" here to mean a state's or state actor's laws, regulations, or other policies which act on private persons.

neutral rule of general applicability.  As discussed in the free speech section above, we find a genuine issue of fact in the record as to whether Defendants' requirement of script adherence was pretextual.  Therefore, we remand for further proceedings on whether the script adherence requirement was discriminatorily applied to religious conduct (and thus was not generally applicable).  Unless Defendants succeed in showing that the script requirement was a neutral rule of general applicability, they will face the daunting task of establishing that the requirement was narrowly tailored to advance a compelling governmental interest.  See id. (citing Lukumi, 508 U.S. at 532, 542).

If Defendants succeed on remand in showing their requirement was not pretextual but rather was a neutral and generally applicable requirement, Axson-Flynn argues that the two exceptions to the Smith rule apply, and if she were to be successful in establishing an exemption, Defendants' conduct would not be sheltered by the rational basis test of Smith.  The first exception, following Wisconsin v. Yoder, 406 U.S. 205 (1972), has come to be called the "hybrid rights" exception: when a free exercise claim is coupled with some other constitutional claim (such a free speech claim), heightened scrutiny may be appropriate.  Smith, 494 U.S. at 881-82.  The second exception, following Sherbert v. Verner, 374 U.S. 398 (1963), is the "individualized exemption" exception: where a state's facially neutral rule contains a system of individualized

- 34 -

exemptions, a state "may not refuse to extend that system to cases of 'religious hardship' without compelling reason." Smith, 494 U.S. at 884 (quoting Bowen v. Roy, 476 U.S. 693, 708 (1986)). The district court held that Axson-Flynn's case fit within neither Smith exception. Axson-Flynn, 151 F. Supp. 2d at 1334, 1341. For the reasons that follow, we disagree and find that Axson-Flynn has raised a genuine issue of material fact as to both exceptions.

### A. Hybrid rights

In Swanson v. Guthrie Indep. Sch. Dist. No. I-L, 135 F.3d 694, 699 (10th Cir. 1998), we recognized the hybrid-rights free exercise theory discussed in Smith, but declined to apply that theory to a claim by a home-schooled student that she should be allowed to attend public school on a part-time basis. We acknowledged in Swanson that "[i]t is difficult to delineate the exact contours of the hybrid-rights theory discussed in Smith." Id. We stated that the hybrid-rights theory "at least requires a colorable showing" of infringement of a companion constitutional right, id. at 700, which left open for later development the definition of "colorable" in this context.

In defining "colorability" for purposes of hybrid-rights claims, the Ninth Circuit has required the companion claim to have a "fair probability or a likelihood, but not a certitude, of success on the merits." See Miller v. Reed, 176

F.3d 1202, 1207 (9th Cir. 1999). Cf. Thomas v. Anchorage Equal Rights Comm'n, 165 F.3d 692, 705-06 (9th Cir. 1999) (analogizing the "colorability" test in a hybrid-rights context to the "likelihood of success on the merits" standard for preliminary injunctions and to the pre-AEDPA test of a "colorable showing of factual innocence" required for an evidentiary hearing discussed in Kuhlmann v. Wilson, 477 U.S. 436, 454 (1986)), *withdrawn,* 192 F.3d 1208 (9th Cir. 1999), *on reh'g en banc*, 220 F.3d 1134 (9th Cir. 2000) (vacating decision on ripeness grounds). We find these analogies helpful, and will only apply the hybrid-rights exception to Smith where the plaintiff establishes a "fair probability, or a likelihood," of success on the companion claim.

Our approach strikes a middle ground between the two extremes of painting hybrid-rights claims too generously and construing them too narrowly. Axson-Flynn urges us to adopt the more generous definition of "colorable" that was utilized by the district court, which only required the companion claim to be "non-frivolous." The district court borrowed this definition of "colorable" from Harline v. DEA, 148 F.3d 1199, 1203 (10th Cir. 1998). Axson-Flynn, 151 F. Supp. 2d at 1338. However, the Harline court was not addressing a hybrid-rights free exercise claim, but was rather determining whether a claim was colorable for purposes of establishing waiver of the exhaustion of remedies requirement for judicial review of administrative action. We are not bound by this definition for

- 36 -

the purposes of analyzing a hybrid-rights free exercise claim. The adoption of a "non-frivolous" standard would open the floodgates for hybrid-rights claims, as nearly every plaintiff with a free exercise claim would be able to assert an additional non-frivolous constitutional claim. We decline to allow such a result, given the fact that the hybrid-rights theory has been roundly criticized from every quarter and many have pointed out the danger of interpreting such hybrid-rights claims broadly.[18] As then-Professor McConnell

_____

[18]See e.g. , Knight v. Conn. Dep't of Pub. Health, 275 F.3d 156, 167 (2d Cir. 2001) (characterizing Smith's hybrid rights language as "dicta and not binding on this court" and declining to apply hybrid rights analysis); Kissinger v. Bd. of Trs. of Ohio State Univ. , 5 F.3d 177, 180 (6th Cir. 1995) (characterizing the hybrid rights exception as "completely illogical" and stating, "We do not see how a state regulation would violate the Free Exercise Clause if it implicates other constitutional rights but would not violate the [F]ree Exercise Clause if it did not implicate other constitutional rights"). As Justice Souter noted in Church of Lukumi Babalu Aye, the hybrid rights exception would appear either to swallow the Smith rule entirely or to be entirely unnecessary:

> [T]he distinction Smith draws strikes me as ultimately untenable. If a hybrid claim is simply one in which another constitutional right is implicated, then the hybrid exception would probably be so vast as to swallow the Smith rule, and, indeed, the hybrid exception would cover the situation exemplified by Smith, since free speech and associational rights are certainly implicated in the peyote ritual. But if a hybrid claim is one in which a litigant would actually obtain an exemption from a formally neutral, generally applicable law under another constitutional provision, then there would have been no reason for the Court in what Smith calls the hybrid cases to have mentioned the Free Exercise Clause at all.

Church of Lukumi Babalu Aye, 508 U.S. at 567 (Souter, J., concurring in part and concurring in the judgment).

One commentator has suggested that the hybrid rights exception has little

(continued...)

has pointed out, the <u>Smith</u> Court itself did not have an expansive standard in mind for a separate hybrid-rights cause of action or it would have found a hybrid-rights claim on the facts before it.  <u>See</u> Michael W. McConnell, *Free Exercise Revisionism and the <u>Smith</u> Decision*, 57 U. CHI. L. REV. 1109, 1122.

---

[18](...continued)
teeth, and that lower courts have found valid hybrid rights claims to exist only when the plaintiff would have won on a separate constitutional claim anyway:

> Analysis of hybrid claims in the lower courts leads to the unmistakable conclusion that the hybrid "calculus" or logical interpretation (i.e., two loser constitutional claims = one winner constitutional claim) simply is not being applied.  Instead, these cases are being decided based solely upon the strength or weakness of the "other" constitutional provision without reference to the Free Exercise Clause.  This explains two general principles which apply to virtually every hybrid case.  First, when a court allows a hybrid to "win" by applying strict scrutiny to the claim, it never does so as the primary basis for the decision.  Either the case had already been decided on some other basis (such as free speech), or strict scrutiny was mandated by the state constitution anyway.  Second, the "success" of hybrid claims is directly tied to the constitutional strength of the right with which free exercise is combined. Thus, free speech hybrids are more likely to win than parental right to educate hybrids.

William L. Esser IV, Note, *Religious Hybrids in the Lower Courts: Free Exercise Plus or Constitutional Smoke Screen?*, 74 NOTRE DAME L. REV. 211, 242-43 (1998) (footnotes omitted).  <u>See also</u> Carol M. Kaplan, Note, *The Devil is in the Details: Neutral, Generally Applicable Laws and Exceptions from <u>Smith</u>*, 75 N.Y.U. L. REV. 1045, 1068 (2000) ("[A]s applied in most cases, the hybrid rights exception is generally given an extremely narrow interpretation.  As a result, hybrid claims are commonly restricted to those enumerated in <u>Smith</u>, with courts finding for the religious party predominantly in cases where the decision could stand on the independent constitutional right."); Michael W. McConnell, *Free Exercise Revisionism and the <u>Smith</u> Decision*, 57 U. CHI. L. REV. 1109, 1122 (1990) (reflecting on the difficulties of the hybrid-rights doctrine, stating that "a legal realist would tell us . . . that the <u>Smith</u> Court's notion of 'hybrid' claims was not intended to be taken seriously").

On the other hand, it makes no sense to adopt a strict standard that essentially requires a *successful* companion claim because such a test would make the free exercise claim unnecessary. If the plaintiff's additional constitutional claim is successful, he or she would typically not need the free exercise claim and the hybrid-rights exception would add nothing to the case.[19]

Therefore, we have chosen the middle ground of requiring the hybrid-rights claimant to show that the companion constitutional claim is "colorable." We define this to mean that the plaintiff must show a fair probability or likelihood, but not a certitude, of success on the merits. This inquiry is very fact-driven and must be used to examine hybrid rights on a case-by-case basis.

Because we are remanding on the free speech issue for fact development, we cannot at this point discern whether Axson-Flynn has a fair probability or likelihood of success on her pretext argument in her free speech claim. However, a remand as to this hybrid-rights issue would be pointless because, as we will explain in the last section of this opinion, although we are remanding Axson-

---

[19] See e.g., Christopher C. Lund, *A Matter of Constitutional Luck: The General Applicability Requirement in Free Exercise Jurisprudence*, 26 HARV. J. L. & PUB. POL'Y 627, 631 n.20 (2003); Anthony Merlino, *Tightening the Seal: Protecting the Catholic Confessional from Unprotective Priest-Penitent Privileges*, 32 SETON HALL L. REV. 655, 689 (2002); Timothy J. Santoli, *A Decade After Employment Division v. Smith: Examining How Courts Are Still Grappling with the Hybrid-Rights Exception to the Free Exercise Clause of the First Amendment*, 34 SUFFOLK U. L. REV. 649, 669 (2001); Jonathan B. Hensley, *Approaches to the Hybrid-Rights Doctrine in Free Exercise Cases*, 68 TENN. L. REV. 119, 131-32 (2000).

Flynn's free exercise claim, Defendants are entitled to qualified immunity on the hybrid rights theory.


**B.  The individualized-exemption exception**

We turn now to Axson-Flynn's argument that her case is covered by the second <u>Smith</u> exception, which holds that "in circumstances in which individualized exemptions from a general requirement are available, the government may not refuse to extend that system to cases of religious hardship without compelling reason."  <u>Church of Lukumi Babalu Aye</u>, 508 U.S. at 537 (citing <u>Smith</u>, 494 U.S. at 884) (internal quotation marks omitted).  The Court has never explained with specificity what constitutes a "system" of individualized exceptions, and as with the hybrid rights exception, courts and commentators are divided on the question.

Our Circuit has held that a system of individualized exemptions is one that "give[s] rise to the application of a subjective test."  <u>Swanson</u>, 135 F.3d at 701. Such a system is one in which case-by-case inquiries are routinely made, such that there is an "individualized governmental assessment of the reasons for the relevant conduct" that "invite[s] considerations of the particular circumstances" involved in the particular case.  <u>Smith</u>, 494 U.S. at 884.

Perhaps the best example of such a system, and indeed the one in which this exception originated, is a system of unemployment benefits which requires claimants to show "good cause" as to why they are unable to find work. In Sherbert v. Verner, 374 U.S. 398 (1963), a Seventh Day Adventist was fired by her employer because she refused to work on Saturdays, which her faith did not permit. Sherbert applied for unemployment benefits but was denied for failing to demonstrate "good cause" for her unemployment. The Supreme Court held that the denial of benefits violated the Free Exercise Clause because it "force[d] [Sherbert] to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand." Id. at 404.

In Sherbert, then, the "good cause" exemption required an official to examine an applicant's specific, personal circumstances. That is, every unemployment compensation decision was made on a case-by-case basis. This being so, the state could not refuse to accept religious reasons for unemployment on equal footing with secular reasons for unemployment. Or, as the Smith Court explained the holding in Sherbert and the Court's other unemployment compensation cases, "where the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious hardship' without compelling reason." Smith, 494 U.S. at 884.

Smith's "individualized exemption" exception is limited, then, to systems that are designed to make case-by-case determinations. The exception does not apply to statutes that, although otherwise generally applicable, contain express exceptions for objectively defined categories of persons. See Swanson, 135 F.3d at 698, 701 (holding that a school district's policy requiring full-time attendance by all students did not "establish a system of individualized exceptions that give rise to the application of a subjective test" when the exceptions to the policy were confined to "strict categories of students," such as fifth-year seniors and special education students); Hicks v. Halifax County Bd. of Educ., 93 F. Supp. 2d 649, 657 n.4 (E.D.N.C. 1999) (holding that a "limited financial hardship exception to the [school's] uniform policy does not rise to the level of a 'system of individualized exemptions'") (quoting Smith, 494 U.S. at 884). But see Fraternal Order of Police v. City of Newark, 170 F.3d 359, 364–66 (3d Cir. 1999) (holding that because a police department regulation prohibiting beards allowed for medical exemptions but not religious exemptions, it was not generally applicable under Smith). While of course it takes some degree of individualized inquiry to determine whether a person is eligible for even a strictly defined exemption, that kind of limited yes-or-no inquiry is qualitatively different from the kind of case-by-case system envisioned by the Smith Court in its discussion of Sherbert and related cases.

With this understanding of the "individualized exemption" exception, we now address whether Axson-Flynn's case falls within the exception. We conclude that there is an issue of fact as to this point and thus we remand.

The syllabus for First-Year Acting (the ATP class that Axson-Flynn was taking in the fall of 1998) contained a curricular requirement to do improvisational work. However, a Jewish student named Jeremy Rische asked for and received permission to avoid doing an improvisational exercise on Yom Kippur without suffering adverse consequences. Defendant Barbara Smith, who taught First Year Acting, gave him this exemption despite the fact that, in Rische's words, "she said it would be an exercise that couldn't be made up, because it was one of the exercises by—an improv exercise that involved the whole class, and it would be almost impossible to make up." Rische was never penalized, his grades were never lowered, and he was never asked to make up the assignment in any way. Axson-Flynn argues that Defendants' willingness to grant an exemption to Rische demonstrates that the ATP had a system of individualized exemptions in place. That Defendants did not grant her an exemption, Axson-Flynn argues, constitutes "discriminat[ion] among members of different religious faiths" that violates the Free Exercise Clause.

When this evidence is coupled with the fact that Defendants sometimes granted Axson-Flynn herself an exemption from their script adherence

requirement, we find that the record raises a material fact issue as to whether Defendants maintained a discretionary system of making individualized case-by-case determinations regarding who should receive exemptions from curricular requirements.

The "system of individualized exemptions" need not be a written policy, but rather the plaintiff may show a pattern of ad hoc discretionary decisions amounting to a "system." If we were to require the plaintiff to show that the "system of individualized exemptions" was contained in a written policy, we would contradict the general principle that greater discretion in the hands of governmental actors makes the action taken pursuant thereto more, not less, constitutionally suspect. See e.g., Cantwell v. Connecticut, 310 U.S. 296, 305 (1940).

Because Axson-Flynn has raised a genuine issue of material fact as to whether Defendants maintained a discretionary system of case-by-case exemptions from curricular requirements, we hold that summary judgment on her free exercise "individualized exemption" claim was improper. Accordingly, we reverse and remand.

## III.  QUALIFIED IMMUNITY

In addition to granting summary judgment to Defendants on the merits, the district court also held that Defendants were entitled to qualified immunity on both of Axson-Flynn's claims.  Axson-Flynn, 151 F. Supp. 2d at 1342.  "We review the grant of summary judgment de novo, applying the same legal standard as the district court."  Cummins v. Campbell, 44 F.3d 847, 850 (10th Cir. 1994).

"Qualified immunity shields public officials from [section] 1983 liability if their actions did not 'violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Pino v. Higgs, 75 F.3d 1461, 1467 (10th Cir. 1996) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  When a defendant makes a qualified immunity claim on summary judgment, the plaintiff has the burden initially to make a twofold showing: "First, the plaintiff must show that the defendant's alleged conduct violated the law.  Second, the plaintiff must show that the law was clearly established when the alleged violation occurred."  Cummins, 44 F.3d at 850 (internal citation and quotation marks omitted).  In order to satisfy his or her burden to show that the law was clearly established, the plaintiff need not produce a factually identical case, but may instead show that there is a Supreme Court or Tenth Circuit opinion on point, or that his or her proposition is supported by the weight of authority from other

courts. Armijo v. Wagon Mound Pub. Schs., 159 F.3d 1253, 1260 (10th Cir. 1998). This analysis "must be undertaken in light of the specific context of the case, not as a broad general proposition." Saucier v. Katz, 533 U.S. 194, 201 (2001). In rebutting a qualified immunity claim at the summary judgment level, a plaintiff "can no longer rest on the pleadings and the court looks to the evidence before it (in the light most favorable to the plaintiff)[.]" Behrens v. Pelletier, 516 U.S. 299, 309 (1996) (internal citation omitted).

Once the plaintiff makes this showing, the defendant bears the usual burden of a party moving for summary judgment to show that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law. Cummins, 44 F.3d at 850. "More specifically, the defendant must show that there are no material factual disputes as to whether his or her actions were objectively reasonable in light of the law and the information he or she possessed at the time." Id. (internal quotation omitted). At all times during this analysis, "we evaluate the evidence in the light most favorable to the nonmoving party." Id. The determination of whether a defendant is entitled to qualified immunity is not a determination of the merits of the plaintiff's claim; the defendant may be mistaken and still be entitled to qualified immunity if he or she is reasonably mistaken in light of the law and facts. Saucier, 533 U.S. at 204.

**A.      Qualified Immunity as to Axson-Flynn's Free Speech Claim**

As described above, Axson-Flynn alleged in her free speech claim that Defendants' curricular requirement of script adherence was not legitimately pedagogical because it was a pretext for religious discrimination, and she provided evidence creating an issue of fact as to that argument. This asserts a violation of the First Amendment, as is required in the first prong of the qualified immunity analysis. See Cummins, 44 F.3d at 850.

As to the second prong, it is clearly established that a pretextual speech restriction that is not justified by a legitimate pedagogical concern, and is based rather on religious discrimination, would violate Axson-Flynn's First Amendment rights. In Hazelwood, 484 U.S. at 273, the Supreme Court was unambiguous in requiring school-sponsored speech restrictions to be justified by "legitimate" pedagogical concerns. Additionally, the Court in Ewing, 474 U.S. at 225, was clear in requiring courts to override faculty judgment when it is a pretext for an impermissibly ulterior motive. Because the law is clearly established and there exists a material factual issue as to the objective reasonableness of Defendants' actions, the qualified immunity defense to the free speech claim must fail on summary judgment. See Cummins, 44 F.3d at 850.

**B.**     **Qualified Immunity as to Axson-Flynn's Free Exercise Claim**

In Axson-Flynn's free exercise claim, she alleged discriminatory application of Defendants' script requirement so that it would no longer be considered a neutral rule of general applicability under Smith. She presented evidence creating an issue of material fact as to this argument, and sufficiently stated a claim of First Amendment violation. Additionally, the law is clearly established that if a governmental requirement burdening a religious practice is not neutral or generally applicable, it is subject to strict scrutiny and will not pass constitutional muster unless it is "narrowly tailored to advance a compelling government interest." Tenafly, 309 F.3d at 165 (citing Church of Lukumi Babalu Aye, 508 U.S. at 532, 542). Because Axson-Flynn met her burden of rebutting the qualified immunity defense, and the record shows a material factual issue as to the reasonableness of Defendants' actions, we reverse the district court's granting of qualified immunity in the free exercise claim. See Cummins, 44 F.3d at 850.

Also with regard to Axson-Flynn's free exercise claim, she alternatively alleges that Defendants maintained an ad hoc system of individualized case-by-case exemptions to curricular requirements that they failed to extend to Axson-Flynn because of the religious basis for her request. She presented evidence creating an issue of material fact as to this argument, and sufficiently asserted a

constitutional violation. It was clearly established by the Supreme Court that if a defendant has in place a system of individualized exemptions, it must extend that system to religious exemptions or face strict scrutiny review. See Church of Lukumi Babalu Aye, 508 U.S. at 537 (citing Smith, 494 U.S. at 884). It is also clearly established in this circuit that a system of individualized exemptions is one that is designed to make case-by-case, subjective determinations on exemptions from generally applicable rules. See Swanson, 135 F.3d at 698, 701. Defendants have not shown a lack of disputed fact as to the objective reasonableness of their actions, and we thus reverse the granting of summary judgment on this alternative qualified immunity ground. See Cummins, 44 F.3d at 850.

Finally, Axson-Flynn alternatively alleges that her free exercise claim fell within the "hybrid-rights" exception to Smith's rational basis review, and that Defendants' requirement would not survive strict scrutiny. We agree with the district court that the law regarding this controversial "hybrid-rights" exception is not clearly established, and even this Court has recognized that "[i]t is difficult to delineate the exact contours of the hybrid-rights theory discussed in Smith." Swanson, 135 F.3d at 699. Because the law was not clearly established on hybrid-rights at the time of Defendants' actions, Defendants are entitled to qualified immunity on Axson-Flynn's hybrid-rights argument and we thus affirm

the granting of summary judgment on this point. Summary judgment for Defendants on the hybrid-rights theory does not, of course, equate to summary judgment for Defendants on Axson-Flynn's free exercise claim. As pointed out above, Defendants' ability to rely on the so-called "safe harbor" of <u>Smith</u> depends first upon Defendants' satisfaction of the requirement that their rule is a neutral one of general applicability. That is in genuine dispute on this record, and thus summary judgment is not appropriate for Defendants on Axson-Flynn's free exercise claim. Further, even if the court does conclude on remand that the rule is a neutral one of general applicability, there remains a genuine dispute of fact as to the individualized exemption to <u>Smith</u>. If <u>Smith</u> does not apply either because the rule is not a neutral one of general applicability or because the rule invoked a series of individualized exemptions, then Defendants would have to defend their conduct under the strict scrutiny standard on Axson-Flynn's free exercise claim. Under such a strict scrutiny standard, Defendants have not established a right to qualified immunity.

## CONCLUSION

For the foregoing reasons, we REVERSE the district court's grant of summary judgment to Defendants on Axson-Flynn's free speech and free exercise

claims and REMAND for further proceedings.  We also REVERSE the district court's grant of qualified immunity to Defendants, except to affirm a limited grant of qualified immunity to Defendants on the narrow hybrid-rights exemption under the <u>Smith</u> test with regard to Axson-Flynn's free exercise claim.